STATE OF CONNECTICUT *v.* STEPHEN CONEY
(SC 16681)

Borden, Norcott, Katz, Palmer and Zarella, Js.

---

Argued September 12—officially released December 16, 2003

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence Mariani*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. After a jury trial, the defendant, Stephen Coney, was convicted of one count of murder in violation of General Statutes § 53a-54a (a),[1] and one count of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a).[2] The trial court sentenced the defendant to a term of fifty-five years imprisonment on the count of murder and a consecutive five year term of imprisonment on the weapons possession count, for a total effective sentence of sixty years imprisonment. The defendant appealed from the trial court's judgment to this court pursuant to General Statutes § 51-199 (b) (3).[3] On appeal, the defendant claims that: (1) the trial court improperly denied his motion for a continuance in order to procure an expert surrebuttal witness and thereby deprived the defendant of his due process right to a fair trial as protected by the federal constitution;[4] (2) the state's attorney vio-

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony or of a violation of subsection (c) of section 21a-279, section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d . . . ."

[3] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[4] The defendant's federal constitutional claim is based upon the due process component of the fourteenth amendment to the United States constitution. The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life,

lated the defendant's federal due process right to a fair trial by numerous instances of misconduct in the questioning of witnesses, including the defendant, and in closing arguments;[5] and (3) even if the misconduct of the state's attorney does not rise to the level of a due process violation, this court should use its supervisory power to remedy the repeated and deliberate misconduct of the state's attorney. We conclude that the trial court's denial of the defendant's request for a continuance did not prejudice the defendant and that the state's attorney did not commit prosecutorial misconduct. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 20, 1999, the defendant met an acquaintance, Terence Conyers, at a bar in Waterbury. Also present at the bar that evening was the victim, Shawn Howard. At some point during the night, while the defendant and the victim were seated in close proximity to one another, the victim accused the defendant of being one of a group of individuals who had assaulted him approximately five months earlier. The defendant denied such involvement, and a verbal altercation ensued. The defendant and the victim then agreed to settle their differences by fighting outside the bar.

liberty or property, without due process of law . . . ."

The defendant also claims that his state due process right; Conn. Const., art. I, § 8; to a fair trial was violated by the trial court's denial of his request for a continuance. "Although the defendant also claims a violation under the state due process clause, our decision is confined to the federal constitution because the defendant has failed to provide an independent analysis of the state constitutional issue." *State* v. *Smith*, 255 Conn. 830, 835 n.12, 769 A.2d 698 (2001).

[5] The defendant's federal constitutional claim that prosecutorial misconduct deprived him of his right to a fair trial is based upon the due process clause of the fourteenth amendment to the United States constitution. See footnote 4 of this opinion. The defendant also raises a claim that such misconduct violated his state due process right to a fair trial. The defendant has failed to provide an independent analysis of the state constitutional claim and therefore our review is limited to the federal constitutional claim.

As the defendant and the victim exited the bar through the back door, a number of other persons followed, ostensibly to watch the fight. Before the fight began however, the defendant removed a loaded revolver that he had secreted on his person and began waving the weapon. At the time the defendant's gun was brandished, the distance between the defendant and the victim was approximately eight to ten feet.

Upon seeing the weapon, the group that had gathered to observe the fight scattered. As a result of this hurried mass exodus, no one witnessed the subsequent interaction between the defendant and the victim. Shortly thereafter, the defendant shot the victim once in the left chest area and twice in the lower right abdomen area.

By the time the police arrived and discovered the victim's body, the defendant had already fled the scene. Soon thereafter, however, the police investigation focused on the defendant and, two days following the shooting, the defendant turned himself in to the Waterbury police department. After informing the defendant of his *Miranda* rights,[6] Lieutenant Neil O'Leary and Sergeant James Nardozzi of that police department questioned the defendant as to his involvement in the shooting. The defendant admitted to law enforcement officers that he had become involved in a verbal argument with the victim, that they had continued the argument outside, that he had taken out a loaded gun, and that the gun "went off" during this interaction.

At trial, the defendant's testimony as to the sequence of events essentially mirrored the state's presentation in all material respects. The one significant divergence regarded the defendant's testimony about what had occurred after he had brandished his weapon. The defendant testified that, after he had exhibited the

---

[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

weapon, the victim attempted to strip the gun from him. The defendant further testified that he and the victim began to struggle for control of the weapon, and the gun "went off" three times. After the first two shots had been fired, the victim continued to wrestle for the weapon but, following the third discharge, the victim fell to the ground.

On cross-examination, the defendant estimated the distance between the victim and the weapon at the time the three shots were fired. In the defendant's words, the two individuals were struggling over the weapon and "twirling around"; the two "were right on each other basically"; and the weapon was within inches of the victim, if not in direct contact with him, at the time it discharged.

At the conclusion of the defendant's case-in-chief, the state announced that, based upon the testimony of the defendant, it intended to call Robert K. O'Brien, a criminalist from the state police forensic laboratory (laboratory) to "[a]bsolutely, specifically" rebut the defendant's version of events. The state indicated that O'Brien had performed a scientific analysis known as "distance determination" testing[7] on the defendant's weapon and on the victim's clothing, and that the state would use the evidence to refute the defendant's testimony that the weapon was right up against or within inches of the victim when it was discharged.[8]

---

[7] Distance determination testing is a scientific process by which, through analyzing a weapon that has been involved in a shooting and the "target" material, such as clothing, struck by the bullet, an approximation may be made as to the distance between the muzzle of the weapon and the target material at the time of discharge.

[8] In response to this offer of proof on rebuttal, the defendant indicated to the court that the witness was not a late disclosure, that the defendant was aware of the test, and in fact had requested that O'Brien perform certain tests on the weapon involved in the shooting, and that "[t]here is no problem with the tests or the results."

On rebuttal, O'Brien testified, to a reasonable degree of scientific certainty, that the analysis he had performed on the weapon and on the victim's clothing allowed him to approximate the distances from the muzzle of the gun to the clothing for each of the three shots that had struck the victim. Specifically, O'Brien opined that the hole in the chest area of the target materials was of contact-type origin,[9] and that the two holes in the lower abdomen area of the target material were caused by a firing from a distance of four feet or more.[10]

At the conclusion of O'Brien's testimony, defense counsel indicated to the court that he "may actually have" a surrebuttal witness, and that he would need to make a telephone call regarding the potential testimony. After a brief recess, defense counsel indicated to the court that, although the defense had been aware that O'Brien had performed certain distance tests, and although the defense was in possession of O'Brien's

[9] O'Brien's opinion was based upon his observation that the hole in the chest area was relatively large, suggesting a close proximity at the time of firing, and his detection of melted fibers around the hole. Additionally, O'Brien observed a lack of gunpowder residue in the vicinity of this hole. This observation, in conjunction with the nature of the hole, indicated to O'Brien that the hole was of contact-type origin and that the lack of gunpowder in the area resulted from the majority of gunpowder having traveled into the wound itself. Finally, O'Brien also tested this hole for the presence of lead particles. Such particles are emitted at the firing of a weapon but generally remain present in the area of a bullet hole only when the discharge is from a range of one foot or less. The chest hole tested positive for the presence of lead, again suggesting that the hole was of contact-type origin.

[10] This opinion by O'Brien was based upon the fact that the holes in the abdomen area exhibited a lack of gunpowder residue but, unlike the hole in the chest area, these holes exhibited a lack of methodology consistent with a contact-type discharge, a lack of melting, a lack of lead, and a relatively small size. Because the holes were determined not to be of contact-type origin, O'Brien concluded that the lack of gunpowder residue was explained by the discharges having occurred some distance away from the clothing. Based upon an analysis of the results of test firings with the weapon, O'Brien arrived at the opinion that the firing occurred at a distance of more than three feet; specifically, four feet or more.

report detailing his findings, the defense was surprised by O'Brien's testimony as to exact distances. Apparently defense counsel had spoken previously with O'Brien about his report, and counsel had been under the impression that O'Brien was unable to reach an opinion as to the distances involved in the discharges creating the two abdomen holes. Defense counsel further indicated that he had, at an earlier date, contacted Peter DeForest, a forensic consultant from another state who was well versed in distance determination testing, and that he had spoken generally about the testing process, what facts could be found as a result of the testing, and what opinions could be reached. Defense counsel revealed that it was DeForest whom counsel had just tried to contact and, although DeForest was out of the office and currently unavailable, counsel intended to speak with DeForest that evening to learn more about the reliability of O'Brien's opinions and to determine if DeForest could be used as a surrebuttal witness. The trial court granted the defendant's motion for a continuance until the following morning.[11]

The following morning, June 7, 2001, defense counsel indicated that he had spoken with DeForest regarding the various issues raised by O'Brien's testimony. During this conversation, DeForest expressed his belief that "there might be a possibility that he would come up with a different opinion than . . . O'Brien" but that he

[11] In granting the motion, the trial court indicated that, after speaking with DeForest, defense counsel might well conclude that his cross-examination of O'Brien was adequate and that there would be no need to call DeForest, or, in the alternative, defense counsel may conclude that DeForest should be called to testify. In the event of the latter eventuality, the court told defense counsel that it would need an offer of proof as to the substance and relevance of the proposed testimony before admitting the evidence. Accordingly, the court stated that the jury would be told to report for duty the following afternoon and that the following morning defense counsel either would have decided the surrebuttal evidence was unnecessary and be ready for closing arguments, or would present an offer of proof as to the proposed surrebuttal evidence.

would need to test the materials analyzed by O'Brien, or, at a minimum, he would need to examine the documents reviewed by O'Brien, as well as the notes from his testing, in order to "conclude whether he would [give] an opinion consistent with . . . O'Brien or inconsistent with . . . O'Brien or would fall somewhere in the middle and not want to say anything because he couldn't come up with an opinion . . . ." After advising the court that the requested materials were in the process of being gathered and forwarded to DeForest, defense counsel asked that the offer of proof be delayed until that afternoon or the following morning. The court, in response, expressed dismay that this was being done at the "eleventh hour," and indicated uncertainty as to what impact this potential information would carry. Nevertheless, the trial court acceded to the defense's request and scheduled the offer of proof on DeForest's proposed testimony for that afternoon.

For reasons not apparent from the trial record, the scheduled offer of proof did not take place until the next morning, June 8, 2001. During this offer of proof, defense counsel offered an electronic mail (e-mail) dated June 7, 2001, sent by DeForest, in which DeForest indicated that "*I am concerned* as to whether a distance determination is possible under the circumstances . . . in this case." (Emphasis added.) The e-mail concluded by noting that, if more time were afforded, DeForest "could explore *these possibilities* in more detail by examining the clothing and test targets." (Emphasis added.) Defense counsel indicated that DeForest was available to travel to the laboratory and perform his testing over the weekend, and that if he was able to form an opinion, he would be available to testify in surrebuttal on Monday, June 11, 2001.[12]

---

[12] We note that this availability to testify on Monday presupposed that DeForest's findings would have contradicted the opinion of O'Brien, either by concluding that O'Brien's distance opinion was inaccurate, or by concluding that an opinion as to distance could not properly be formed based on the materials provided. If DeForest performed an independent examination

In ruling on this motion for additional time in which to procure the surrebuttal evidence of DeForest, the trial court stated that it did not believe the existence of distance test results to be a surprise to the defendant; indeed it was the defense that initially had requested the test because it designated the matter as an issue even prior to trial. Moreover, the court took into consideration the late stage of the trial, the fact that the defendant was requesting surrebuttal to the prosecution's rebuttal case, noting that surrebuttal testimony was an "extraordinary . . . request" and one that the court already had afforded the defendant one and one-half days to explore. Further, the court factored in the possibility of further defense requests for continuances the following week and the fact that defense counsel's cross-examination of O'Brien had been thorough, thereby ameliorating any possible harm attendant to a failure to present an expert to refute O'Brien. In light of this constellation of factors, the court denied the defense motion for a continuance.

I

## THE DENIAL OF THE DEFENDANT'S MOTION FOR A CONTINUANCE

The defendant first claims that the trial court abused its discretion by improperly refusing to grant a motion for a continuance in order for the defendant to procure surrebuttal expert evidence. Specifically, the defendant claims that the trial court's exercise of its discretion was arbitrary in that: (1) the trial court improperly insisted that jury deliberations begin on June 8, 2001, and rejected a reasonable request for a continuance limited to just one additional business day; (2) the trial court improperly focused on the defense's awareness that distance determination was an issue in the case

and his opinion corroborated that of O'Brien, the defense certainly would not have called him as a surrebuttal witness.

instead of focusing on the surprise of O'Brien's testimony and the fact that the prosecution had waited until rebuttal to call O'Brien as a witness, thus compounding the surprise; (3) the trial court improperly precluded surrebuttal expert testimony that was both highly relevant and would have contradicted O'Brien's expert testimony; (4) the window of one and one-half days within which to procure the surrebuttal testimony afforded the defendant by the trial court was insufficient; and (5) a delay of one additional business day would have caused no prejudice to the state and no harm to the jury. As a result of these improprieties, the defendant contends, the trial court's decision was an abuse of its discretion and prejudiced the defendant by depriving him of a fair trial.

In response, the state, relying principally upon our decisions in *State* v. *Aillon*, 202 Conn. 385, 394, 521 A.2d 555 (1987), and *State* v. *Cavell*, 235 Conn. 711, 729, 670 A.2d 261 (1996), claims that the denial of the defendant's request for a continuance was well within the bounds of the trial court's discretion. Specifically, the state asserts that the trial court's denial of the motion for a continuance was not an abuse of discretion because: (1) the defense request was untimely, having occurred exceedingly late in the trial proceedings; (2) the defendant bore responsibility for this tardiness because the defense was well aware of the import of distance determination prior to trial and had been afforded ample time within which to procure expert testimony; (3) the defense already had been afforded a continuance to pursue potential surrebuttal testimony and the trial court properly precluded further delays; (4) additional delay would have had an adverse impact upon the jury; and (5) the legitimacy of the defendant's claim that a continuance was necessary was diluted by his wholly speculative offer of proof with regard to the surrebuttal evidence. We conclude that the defendant

has not demonstrated that the potential expert surrebuttal testimony of DeForest would have been helpful to the defense and, accordingly, the defendant has not provided the requisite showing of prejudice due to the trial court's denial of the motion for a continuance.

The following additional facts guide our resolution of this issue. On May 16, 2001, after the jury had been selected for the defendant's trial but two weeks prior to the commencement of trial, defense counsel filed a motion to compel discovery from the state. In this motion, the defendant requested that the trial court order certain evidence in the state's possession, specifically the defendant's weapon and the victim's clothing, be made available to the laboratory in order that gunshot residue testing be performed. At the May 21, 2001 hearing on this motion, defense counsel indicated that such distance determination testing was "material to the preparation of the defense." In order to alleviate concerns that testing so soon before trial might delay the commencement of the trial, defense counsel indicated that he already had spoken with O'Brien at the laboratory and, if the materials were received at the laboratory by May 22, 2001, the testing could be completed by May 25, 2001, four days before trial. In response, the trial court granted the defense motion and ordered that the weapon and the articles of clothing be transported to the laboratory for distance determination testing.

On May 29, 2001, following analyses of the weapon and the articles of clothing, O'Brien issued a report detailing the results of his examination. In relevant part this report indicated that no gunpowder particles were detected around any of the three holes and melted fibers were detected around the hole located in the upper left area of the victim's clothing. The report concluded that the hole located in the upper left area of the clothing "exhibited physical characteristics consistent with a

contact-type discharge." In addition, based upon the results of test firings of the weapon, "it was determined that the majority of gunpowder was absent at approximately [five] feet."[13]

At trial, the state did not call O'Brien as a witness during its case-in-chief.[14] The defense's case-in-chief consisted solely of the defendant's testimony, including testimony regarding the proximity of the defendant and the victim at the time the weapon discharged.

After O'Brien's direct testimony in rebuttal, the defense conducted a thorough cross-examination of the witness.[15] In particular, he elicited from O'Brien that: (1) it was essential to the validity of the test results that a recreation, as precise as possible, of the circumstances surrounding the underlying incident be constructed; (2) the absence of gunpowder on a target can be explained not only by spatial distance between the weapon and the target, but also by something in the path of the gunpowder's trajectory blocking the residue from reaching the target; (3) O'Brien's tests were conducted indoors, free from the elements, although the

[13] We note that this May 29, 2001 report, while clearly indicating that the hole in the chest area was of contact-type origin, does not expressly state an opinion as to the distances involved in the discharges creating the two holes in the abdomen area.

[14] The issue as to the distance between the victim and the weapon, however, did arise during the state's case-in-chief. On June 5, 2001, the state presented the testimony of Arkady Katsnelson, the medical examiner who had performed the autopsy on the victim. Katsnelson opined that, due to the size of the wound in the chest area, that particular wound was of contact-type origin. Moreover, although Katsnelson also concluded that the two entry wounds to the abdomen area were inconsistent with contact-type injuries, he could not determine the order in which the shots had been fired, nor could he render an opinion, aside from noncontact, as to the distance from which the two abdomen wounds were inflicted.

[15] Prior to commencing this examination of O'Brien, in which the witness' methodology and conclusions were tested, defense counsel did not request a continuance in order to prepare for the cross-examination, and in no way indicated to the court an inability to proceed with immediate questioning.

underlying incident had occurred outside and during rain showers; (4) rainwater falling on a target could impact the gunpowder residue on the material; (5) the handling of the target, as well as the existence of blood on the target, could impact gunpowder residue remaining on the material; (6) when the target materials were removed from their evidentiary packaging, loose particles fell out of the package; and (7) distance determination analysis is not an "exact science." It was after this cross-examination that the defendant made his various requests for continuances, all of which were granted except for the final request for a continuance until June 11, 2001.

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Internal quotation marks omitted.) *State* v. *Berube*, 256 Conn. 742, 759, 775 A.2d 966 (2001). In addition, we consistently have acknowledged that "[o]ur role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives." (Internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 711, 805 A.2d 705 (2002).

We have articulated a number of factors that appropriately may enter into an appellate court's review of a trial court's exercise of its discretion in denying a

motion for a continuance. Although resistant to precise cataloguing, such factors revolve around the circumstances before the trial court at the time it rendered its decision, including: "the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the defendant's personal responsibility for the timing of the request . . . ." *State* v. *Hamilton*, 228 Conn. 234, 240, 636 A.2d 760 (1994).

"In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis." Id., 242. In connection with this inquiry into harmless error, "[w]e distinguish between two types of cases: those in which a constitutional right has been implicated by a denial of a continuance, and those of a nonconstitutional nature." Id., 243. Although prejudice is presumed in instances in which a defendant has suffered a deprivation of a constitutional right, in order to establish reversible error in nonconstitutional claims, "the defendant must prove both an abuse of discretion and harm . . . ." Id., 244. In this evaluation as to whether the party denied a continuance has been harmed, we have found prejudice when the denial of a continuance precluded a defendant from obtaining the testimony of a witness known to possess exculpatory information. *State* v. *Williams*, 200 Conn. 310, 315–18, 321, 511 A.2d 1000 (1986). We have declined, however, to find prejudice in instances in which a defendant can do no more than offer mere conjecture or rank speculation as to the harm flowing from a denial of a continuance. *State* v. *Aillon*, supra, 202 Conn. 394–96 (no abuse of discretion for trial court to deny motion for continuance in order to obtain expert witness testimony when moving party could make no

evidentiary showing that expert had examined evidence at issue and could offer testimony favorable to defendant).

The defendant claims that the trial court's denial of the motion for a continuance in order to procure expert surrebuttal testimony violated his due process right to a fair trial under the fourteenth amendment to the United States constitution. Yet, "[w]e have previously stated that there is no constitutional right to present surrebuttal evidence. . . . The presentation of surrebuttal evidence is a matter resting squarely within the discretion of the trial court. . . . The defendant must demonstrate some compelling circumstance and the proffered evidence must be of such importance that its omission puts in doubt the achievement of a just result." (Internal quotation marks omitted.) *State* v. *Cavell*, supra, 235 Conn. 729. As a nonconstitutional claim, the defendant consequently shoulders the burden of demonstrating both an abuse of the trial court's discretion and resulting harm. *State* v. *Hamilton*, supra, 228 Conn. 244.

In the present case, we need not decide whether the trial court's denial of the defendant's request for a continuance was improper because the defendant has not sufficiently demonstrated any prejudice flowing from the denial. The record reveals that nothing in the defendant's proffer in connection with DeForest indicated that DeForest had an opinion inconsistent with that of O'Brien, or that, if given the opportunity to conduct an independent examination, DeForest would have arrived at conclusions different than those of O'Brien.

It is well settled that, in order for surrebuttal testimony to be admissible, "[t]he defendant must demonstrate some compelling circumstance and the proffered evidence must be of such importance that its omission puts in doubt the achievement of a just result." (Internal

quotation marks omitted.) *State* v. *Cavell*, supra, 235 Conn. 729. In the context of expert witness testimony, it is equally well settled that "[a]n expert opinion cannot be based on conjecture or surmise but must be 'reasonably probable.' " *Aspiazu* v. *Orgera*, 205 Conn. 623, 632, 535 A.2d 338 (1987).

The surmise of defense counsel that "there might be a possibility that [DeForest] would come up with a different opinion than . . . O'Brien" was simply an inadequate foundation for a proffer of surrebuttal expert testimony.[16] Put differently, there was nothing presented to the trial court, other than conjecture and potentialities, that indicated DeForest's testimony would have contradicted O'Brien's testimony.[17]

In circumstances analogous to those present in.this appeal, we previously have concluded that a defendant's failure to demonstrate prejudice flowing from a trial court's denial of a motion for a continuance is fatal to an abuse of discretion claim. In *State* v. *Aillon*, supra, 202 Conn. 395–96, we observed that the defendant's request for a continuance was grounded solely upon a representation that a substitute expert was willing to

---

[16] This proffer inadequately addressed the three purposes for offers of proof to a trial court: (1) to make the court aware of the legal theory under which the evidence is admissible; (2) to provide the court with the specific nature of the testimony in order that an admissibility determination can be made; and (3) to create an adequate record for appellate review. *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986).

[17] Moreover, the record reveals that in correspondence dated September 14, 2001, some three months after the defendant's trial had been concluded, DeForest indicated that he still had not conducted an independent examination of the material at issue or arrived at his independent opinion with regard to the distance issue. As a result, this September 14 correspondence merely expressed DeForest's "[*concern*] as to whether a distance determination [was] possible under the circumstances . . . in this case," and that, with time, he "could have *explored these possibilities* by examining the clothing and test targets and by conducting experiments." (Emphasis added.) To this day, it remains pure speculation as to whether the testimony of DeForest would have been relevant in surrebuttal.

examine the evidence and " 'would be in a position to testify' " in approximately two weeks. "The record does not show that [the substitute expert] ever analyzed the evidence, let alone that his testimony would have been favorable to the defendant. Having failed to make more than a speculative showing of prejudice, the defendant has necessarily failed to demonstrate that the trial court abused its discretion in denying his motion for a continuance." Id., 396; see also *State* v. *Cavell*, supra, 235 Conn. 730 n.12.

We find *Aillon* particularly instructive, and we conclude that the defendant in the present case has failed to sustain his burden of demonstrating prejudice as a result of the trial court's denial of the request for a continuance. Accordingly, we conclude that the trial court's denial of the defense motion for a continuance did not constitute an abuse of discretion.

## II

## PROSECUTORIAL MISCONDUCT CLAIMS

The defendant next claims that pervasive prosecutorial misconduct deprived him of his due process right to a fair trial. Specifically, the defendant claims that the state's attorney committed misconduct when he: (1) injected his personal opinion into the trial during the examination of witnesses and during closing arguments; (2) became an unsworn witness during the examination of witnesses and during closing arguments; (3) appealed to the passions and emotions of the jury and injected extraneous matters into the trial; and (4) asked the defendant to comment on the veracity of police officers called by the state as witnesses during its case-in-chief. We disagree.

The defendant's claims of prosecutorial misconduct in the present case are analogous to those we recently addressed in *State* v. *Singh*, 259 Conn. 693, 793 A.2d

226 (2002). In *Singh*, as the defendant here contends, the claim was that the cumulative effect of the state's attorney's numerous improprieties sufficiently infected the proceedings with a taint of fundamental unfairness such that the defendant suffered a denial of due process. Id., 699. Accordingly, as in *Singh*, we will "address each [claim] in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial." Id., 702.

The defendant failed to object at trial to any of the prosecutorial statements now claimed to constitute misconduct. Therefore, the defendant "may prevail only if he satisfies all four requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)."[18] *State* v. *Singh*, supra, 259 Conn. 699. Furthermore, "[w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, 264 Conn. 1, 165, 836 A.2d 224 (2003). We conclude that the defendant has failed to establish that any of the prosecutorial statements were improper.

Prior to analyzing the defendant's specific claims of prosecutorial misconduct, we set forth the well established principles that guide our inquiry as to all of his claims. "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In

[18] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . .

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 699–700.

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws

prescribe." (Citations omitted; internal quotation marks omitted.) Id., 701.

Moreover, in analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. "The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial, an inquiry that in the present case necessarily will require evaluation of the defendant's other misconduct claims." *State* v. *Ceballos*, 266 Conn. 364, 381–82 n.29, 832 A.2d 14 (2003).

## A

### Whether the Prosecutor Improperly Injected His Opinion into the Trial

The defendant first claims that, during the examination of Wilbur Wright, a state's witness, as well as during cross-examination of the defendant, the prosecutor impermissibly expressed his opinion to the jury that the testimony of the witness and the defendant was not credible. In addition, the defendant claims that the state's attorney exacerbated this misconduct by expressing his opinion during closing arguments that the defendant's version of events was unworthy of belief. We disagree with the defendant that the comments of the state's attorney improperly expressed a personal opinion.

"It is well established that a prosecutor may not express her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant. . . . Such expressions of personal opinion

are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 304–305, 755 A.2d 868 (2000).

During the state's case-in-chief, the state's attorney called Wright, a bouncer who was working at the bar on the night of the incident in question. Soon after the incident, Wright went to the police station and gave a written statement to the police. In that statement, Wright indicated that he had heard the defendant arguing with a group of individuals in back of the bar and that he had overheard the defendant say, " 'I'm tired of this shit, they think I'm afraid of them.' " At trial, Wright testified, inconsistently with that prior statement, that the group of people were "[t]alking, not arguing" or were "loud talking," and that it was not the defendant who had said "I'm tired of this shit," but that it was Wright himself who had made the statement after unsuccessfully trying to break the group up and just prior to calling the police to deal with the group. Wright further indicated that, although he had signed the inconsistent written statement at the police station, he had misread the statement and did not catch the errors. On redirect examination, Wright testified that he had been a friend to the defendant's parents for more than twenty years. Following that statement, the state asked, "And now the only thing that you disagree with in this statement are the things that are damaging to the defendant, is that correct?" The trial court sustained the defendant's objection to this question and the state was allowed to rephrase the inquiry in a manner that highlighted that the only inaccuracies claimed by Wright in the written statement were the portions indicating that the defendant was arguing and that the defendant had

said " 'I'm tired of this shit, they think I'm afraid of them.' "[19]

There was no impropriety in the state's attorney's questioning of Wright. Furthermore, there is no basis for the defendant's claim that by this exchange, "the prosecutor clearly conveyed *his opinion* that his witness was lying in order to protect the defendant." (Emphasis added.) Wright admitted that he had signed the statement and further admitted that he was now in disagreement with certain portions of that signed statement. Accordingly, that inconsistency was a proper source of impeachment pursuant to § 6-10 of the Connecticut Code of Evidence.[20] Furthermore, the state's elicitation of the potential bias of Wright also was proper under § 6-5 of the Connecticut Code of Evidence.[21]

---

[19] The following colloquy took place on the state's attorney's redirect examination of Wright:

"Q. The only thing you disagree with now is they were arguing ahead of time and that you heard [the defendant] say he was tired of this and that they think I am afraid of them, that is the only thing you disagree with in that statement now?

"A. I said I am tired of it because I just started working there and people wasn't used to me telling them what to do.

"Q. Everything else that the police put in here, is accurate. The only things that are not accurate are the things that show [the defendant] was arguing with the other person?

"A. I didn't see him. There was a lot of people there talking like I said before.

"Q. That is what I am asking you, everything else in here is correct?

"A. Yeah.

"Q. Except for where you say that [the defendant] was in an argument with another guy, you are telling us now that is not true?

"A. Plus one other thing, the statement read. The statement read that he said, f— it. I said f— it. I am tired of this, call the police nobody listens to me."

[20] Section 6-10 (a) of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness."

[21] Section 6-5 of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely."

Turning to the defendant's claims of misconduct in the cross-examination of the defendant and in the state's attorney's closing statement, the defendant raises several instances of alleged impropriety. During his testimony, the defendant indicated that he turned himself in once he had learned that he was wanted for murder. In response, the state's attorney asked, "You are telling this jury you didn't find out the police wanted you until two days after the murder?"

We do not view the state's attorney's question as improper, nor are we persuaded that the state's attorney interjected his personal opinion into the proceedings. In his testimony the defendant had indicated that, following the incident, he had traveled to the house of his girlfriend, his brother, his sister, and his friends, and that he had been in the company of at least some individuals who were aware that the police were searching for him. As the jury had heard evidence that certain individuals were aware that the police were looking for the defendant on August 20, 1999, and the defendant was at times in the company of those persons, it was proper for the state's attorney to attempt to cast doubt on the defendant's testimony that he was unaware that the police were seeking him until two days after the incident.

Also on cross-examination, the defendant admitted to telling a string of lies in connection with the events of August 20, 1999.[22] In response, the state's attorney's

---

[22] The following colloquy took place on the state's attorney's cross-examination of the defendant:

"Q. . . . And it's fair to say, sir, isn't it that you lied to Tanya Parker [Coney] when you first saw her about what had happened, right?

"A. Yes.

"Q. And you lied to the police when you were turned in?

"A. Yes.

"Q. And now didn't you lie to every family member you came into contact with when they asked you what had happened?

"A. Not really. I didn't really talk to many people about it."

asked the defendant, "Now you come in here and for the first time you expect this jury to believe your testimony?" We do not find the statement to be improper. A prosecutor properly may comment on the credibility of a witness where such comment reflects reasonable inferences from evidence adduced at trial. *State* v. *Burton*, 258 Conn. 153, 169–70, 778 A.2d 955 (2001); *State* v. *Holmes*, 64 Conn. App. 80, 93, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001). "[B]y exercising his fifth amendment right to testify on his own behalf, it is axiomatic that a defendant opens the door to comment on his veracity. It is well established that once an accused takes the stand and testifies his credibility is subject to scrutiny and close examination. . . . A defendant cannot both take the stand and be immune from impeachment. . . . An accused who testifies subjects himself to the same rules and tests which could by law be applied to other witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Alexander*, supra, 254 Conn. 297–98.[23]

We also find no impropriety in the state's attorney's question, which followed the defendant's statement that he was just "saying what happened," asking, "Certainly it's the version of events that is most favorable to you, isn't it?" As an advocate, the state's attorney may permissibly employ forceful arguments based upon the facts in evidence and the reasonable inferences drawn from such facts. *State* v. *Reynolds*, supra, 264 Conn. 162.

During his closing argument, the state's attorney said, "And you heard his testimony and certainly I heard it

---

[23] We are of course mindful that the phrasing of this question is imbued with a degree of sarcasm. By indicating that the defendant had been wholly dishonest in prior statements, the state's attorney was attempting to imply that the defendant was also being dishonest in his trial testimony. We do not believe, however, that this question traversed the bounds of proper conduct. Although prosecutors are bound by constitutional constraints and the restraints of adversarial propriety, they are not shackled by the chains of inadequate advocacy.

and it wasn't all that clear, but what I get out of it is his version of events is that he pulled out the gun, people scattered but the one person that doesn't run is [the victim] and he attacks him. And then somehow this revolver which takes three separate trigger pulls, goes off three times. The gun just goes off during the struggle and [the victim] ends up dead." This statement was merely a fair encapsulation of the defendant's testimony and did not inject into the trial a personal opinion of the state's attorney that the defendant's story was not credible. Each of the statements made by the prosecutor referred to facts in evidence.[24]

The defendant also asserts that the state's attorney committed misconduct in his closing argument when he characterized the defendant's testimony as "evasive," and, in referring to the defendant's testimony that the defendant could not remember exactly how the gun went off, when the state's attorney stated, "How believable is that?" We are not persuaded that either comment was improper. The state's attorney's "evasive" characterization was made during the prosecution's rebuttal closing and was in direct reference to the statements made in the defense's closing argument that the state's expert witness, O'Brien, had refused to answer fully the questions posed to him by defense counsel.[25] The state's attorney's credibility

---

[24] The state had presented the testimony of Marshall Robinson, a firearms expert, in its case-in-chief. During this testimony, Robinson indicated that he had examined the particular weapon involved in the crime and had concluded that the weapon would need three separate pulls of the trigger in order to discharge three times.

[25] The defense attorney stated as follows in his closing argument: "There are two types of witnesses that come and sit on the stand, lay witnesses that never testified in court before or testified very rarely. Then there are the others, the ones that come in and testify on a relevancy basis, police officers and experts. They all have different ways of avoiding questions that they don't want to answer. The lay witness when he doesn't want to answer a question that you are putting into fact, he might get argumentative and start arguing with you or will get belligerent. You saw an example of that with Darius Van Holt. He was arguing from the beginning he doesn't want

statement,[26] in context, also was not inappropriate but rather was based upon the defendant's own testimony and was fair argument drawn therefrom.

The defendant next claims that the prosecutor committed misconduct during his closing arguments by stating that: (1) it was natural for the group to scatter when the defendant removed his weapon because "I would think people see the gun they start heading back into the bar"; (2) "this case . . . I would submit to you is not a case about self-defense. He doesn't say he did it on purpose. Self-defense means I did it. I meant to do it, but I was justified. I had a reason. He is not saying that. So although you have to consider self-defense, I really don't think it is that issue in this case"; (3) "[w]as this a reasonable use of force in a fistfight, of course not"; and (4) various exceptions to the rules of self-defense "don't apply." These statements were permissible argument based upon the facts in evidence. The mere use of phrases such as "I would think," "I would submit," and "I really don't think," does not transform

to answer any questions. He wanted to get out. What he wanted was to get out regardless of what the question was. Take a look at . . . O'Brien. He is on the other end of the stick. Looking for something that I don't get argumentative, they just try to veer off into what they want to say. Also, in a professional manner how rain and water would affect it, he starts talking about some study he and [chief criminalist Henry] Lee did with wind tunnels."

[26] The state's attorney stated as follows in his closing argument: "Isn't the mother of all answers when you want to hide something, I don't remember. That was the defendant's testimony. He killed a man and he doesn't remember. I don't remember how the gun went off. I don't remember how many times the gun went off. I don't know which shot was first, which shot was second, or which shot was third. . . . [W]e have all been in situations where events make an impression on us. And whatever it is in your life, maybe you just avoided getting in a car accident. You saw a dog get hit by a car or something. You can close your eyes and you can see that instant like you are watching it again. And here is the defendant who had a loaded gun in his hand, a gun that fired three shots into another human being and his testimony is I don't remember. It's like a perfect blackout of the most important thing we're here to decide. During those seconds when the gun went off—I don't know what happened. How believable is that?"

a closing into the improper assertions of personal opinion by the state's attorney. See *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003).

## B

### Whether the Prosecutor Became an Unsworn Witness during Trial

The defendant next claims that the state's attorney became an unsworn witness during the trial by asking questions of certain witnesses regarding conversations between them and the state's attorney prior to trial for the purpose of suggesting that the witnesses were now being dishonest at trial. Specifically, the defendant claims that it was improper for the state's attorney to ask Wright about inconsistencies between his trial testimony and earlier conversations between Wright and the state's attorney,[27] and similarly to question Tanya Parker Coney, the defendant's wife, as to inconsistencies between her trial testimony and prior statements she had given to the police and the state's attorney.[28] We do not agree with the defendant that

---

[27] The following colloquy occurred during the state's attorney's examination of Wright:

"Q. You and I have spoken about this case in the past, right?

"A. Yes.

"Q. You came into my office and spoke to me?

"A. Yes, I did.

"Q. And did you have an opportunity to read this statement?

"A. Yes, I did.

"Q. And what you told me in my office and what you are telling this jury, is not exactly what is in this statement that you gave to the police, is it?"

The witness never answered this question as it was followed by an exchange as to the evidentiary admission of the written statement and, following that exchange, the state's attorney moved on to a different point.

[28] The following colloquy occurred during the state's attorney's examination of Tanya Parker Coney:

"Q. Do you recall stopping in the area of Pearl Lake Road and Spring Lake Roads where there was a pond and a little pond right in front of a house? Do you remember that?

"A. No. I didn't see a pond or a house. . . .

"Q. Do you recall giving statements to the police?

"A. Yes.

the comments of the state's attorney amounted to the prosecutor becoming an unsworn witness at trial.

Under § 6-10 of the Connecticut Code of Evidence; see footnote 20 of this opinion; the use of prior inconsistent statements, whether written or oral, is permissible to impeach a witness. C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.35.2, pp. 482–83. It was therefore proper for the state's attorney to question these witnesses as to the inconsistencies in their statements over time. The fact that the prior statements involved the state's attorney himself is irrelevant.

The defendant also claims that the prosecutor committed misconduct during his closing argument when, in referring to the murder weapon, he stated, "This is not a sophisticated automatic weapon where you pull the trigger once and it goes off three separate times. You don't bump up against it and have it go off. . . . As soon as you hold the cylinder on this gun, it's impossible to fire it. . . . [A]s soon as you get your hand on that cylinder you can't pull the trigger." The statements were not improper. These statements merely drew the jury's attention to the testimony of Marshall Robinson, a firearms expert, who had indicated that the trigger would need to be pulled three times in order to dis-

"Q. Do you recall giving your initial statement, your first statement to the police on August the 21st of 1999?

"A. Yes.

"Q. And did you have an opportunity to read through that when we spoke?

"A. When I spoke to you?

"Q. Yes.

"A. Yes. . . .

"Q. Do you recall in that statement telling the police that he did, in fact, get out of the car in the area of Pearl Lake Road?

"A. I was told to say that. . . .

"Q. Near a nice house with a pond?

"A. Yes. But that was not my words. I didn't know where we were.

"Q. I understand what you're saying, that is not the same, what you signed with the police?

"A. Yes."

charge three times; see footnote 24 of this opinion; and the defendant's testimony that the weapon discharged as he and the victim wrestled for control, both with their hands on the weapon.

## C

## Whether the Prosecutor Appealed to the Passions and Emotions of the Jurors and Injected Extraneous Matters into the Trial

The defendant next claims that the state's attorney improperly appealed to the passions of the jury by indicating that the jury was to " 'do the right thing' " and that the killing was senseless. We disagree with the defendant's claim that the state's attorney exceeded the bounds of permissible closing argument by improperly appealing to the passions of the jury and by injecting extraneous matters into the trial.

When viewed in context, the prosecutor's exhortation to " 'do the right thing' " was nothing more than encouragement for the jury to take their role seriously and act accordingly.[29] In context, the state's attorney was

[29] The state's attorney stated as follows in his closing arguments: "I am going to ask you to do one thing. . . . I know it's probably going to be hard to come back with a verdict in this case, but don't say well, you know, the judge gave us a charge on manslaughter, he doesn't seem like that bad of a guy as he sits here in court and when he testified. Don't do that. This is not the place that we do this Polly Anna stuff, don't—maybe we do it at work because we have to. This courtroom is the place where we have to make the right decision for the right reason based on law not based on sympathy, but based on law and based on common sense."

Later, on rebuttal argument, the state's attorney added: "[T]he older I get the more I know it and we all know it, that doing the right thing is not always the easiest decision. Sometimes it is a hard decision. I don't expect you to go back there and say, oh, boy I am going to have a great weekend since I'll come back with a guilty verdict and get rid of this case. But you have to do the right thing, and it is a hard thing to do. . . . The right decision is a hard decision because obviously you are not supposed to consider it but you are going to affect somebody's life. There is no doubt about that, but this is the place where the right decision gets made. Everybody's done their job. We tried hard [i]n this case. The judge has tried hard. The police have tried hard. I am sure the defendant tried hard. Everybody has done

expressing to the jury that, although their job was a difficult one, nonetheless they were to respect their role and fairly to apply the law to the facts, no matter the result. We note, of course, that the statements of the state's attorney were a double-edged sword. For a jury believing that the state had not proven each element of the crime beyond a reasonable doubt, to "do the right thing" would be to acquit the defendant. The context of this exhortation therefore distinguishes these remarks from situations in which a prosecutor couples a statement that the jury is to "do the right thing" with an indication that the right thing is to convict the defendant. See, e.g., *United States* v. *Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (prosecutor argued that "I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty" [internal quotation marks omitted]).

With regard to the defendant's claim that the prosecutor improperly appealed to the passions of the jury by indicating that this killing was senseless, we similarly are not persuaded of any impropriety.[30] The comments

what they think is right. Now it's your responsibility to enforce the law and to make the right decision based on evidence. You don't have to be happy about it. You don't have to think it's a great thing and like what you're doing, but you have to make the right decision."

[30] In his closing argument, the state's attorney stated: "I don't have to prove that there was a motive. And unfortunately as we all know in today's society, people do things for no reason. People kill each other over parking spaces, people kill each other for no reason whatsoever. And I will submit to you that that is what this case is about." Later, on rebuttal argument, the state's attorney continued: "And again, I ask don't get hung up on trying to understand it or make sense of it. It is a senseless act. [The victim] is dead for no reason. They weren't long time rivals. Somebody wasn't dating somebody's sister or having an affair. He is dead for no good reason, but that doesn't mean it's not a murder. The motive is stupid. I did whatever it is but there was the intent to kill and that makes it a murder case."

of the state's attorney merely were designed to indicate to the jury that, contrary to what they may have seen on television, motive is not a necessary element of murder that the state must prove beyond a reasonable doubt.

## D

### Whether the Prosecutor Improperly Asked the Defendant to Comment on the Veracity of the Police Officers Called as Witnesses

The defendant next claims that the state's attorney committed prosecutorial misconduct by improperly asking the defendant, on cross-examination, to comment on the veracity of the police officers called as witnesses by the state.[31] Specifically, the defendant

---

[31] The following colloquy occurred during the state's attorney's cross-examination of the defendant:

"Q. You told the police that [the victim] rushed into you and tried to take the gun?

"A. Yes.

"Q. The police came in and they were truthful about everything else going on up to the dumpster, right?

"A. Yeah.

"Q. About going down to the pond where you lied about the clothes being, right?

"A. Yes.

"Q. About they were truthful when you say—when you told them the lie about dropping the gun at the scene, right?

"A. Yeah.

"Q. But the only thing they lied about is that you were actually in a physical fight with [the victim] where he was trying to take the gun from you?"

The trial court sustained the defendant's objection as to the form of this question, whereupon the following exchange took place:

"Q. Okay. You sat here while the police were testifying, right?

"A. Yes.

"Q. And you heard me ask them what did the defendant tell you, right?

"A. Yes.

"Q. And they never said that you came in and said, hey, [the victim] was rushing me and trying to take the gun?

"A. No. They said—I heard them say that I said I pointed it at him and shot him."

asserts that the state's attorney, by this exchange, impermissibly implied that, in order to acquit the defendant, the jury would have to conclude that the police officers were lying. We do not agree with the defendant that the state's attorney improperly asked the defendant to comment on the veracity of the state's witnesses.

Recently, in *State* v. *Singh*, supra, 259 Conn. 706, we adopted the "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity." We did so because such questions: (1) impermissibly invade the province of the jury by infringing upon the jury's role in the determination of witness credibility; and (2) create a risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness was deceitful. Id., 707–708. Moreover, we expressly rejected the minority rule that creates an exception to the ban on such questions when "the defendant's testimony is the opposite of or contradicts the testimony of other witnesses, thereby presenting a basic issue of credibility . . . [that cannot] be attributed to defects or mistakes in a prior witness' perception or inaccuracy of memory, rather than to lying." (Internal quotation marks omitted.) Id., 710.

The record reveals that the initial formulation of the state's attorney's question was improper under our rule as articulated in *Singh*. Specifically, the state's attorney's query, "But the only thing [the police] lied about is that you were actually in a physical fight with [the victim] where he was trying to take the gun from you?"; see footnote 31 of this opinion; was an impermissible request for the defendant to comment on the veracity of another witness.

Although the initial formulation was inappropriate, the harm was immediately rectified by the defense counsel's objection to the question which the trial court sustained. Subsequently, the state's attorney asked the

defendant, "And [the police officers] never said that you came in and said, hey, [the victim] was rushing me and trying to take the gun?" The defendant responded, "No. They said—I heard them say that I said I pointed it at him and shot him." This formulation did not ask the defendant to comment upon the veracity of the police officers, but rather placed before the jury, for its credibility determination, the disagreement between the police officers and the defendant as to whether the defendant initially had told police that the gun went off during an altercation. From that, the jury was free to weigh and evaluate the competing statements and decide accordingly. As a result, the question did not impermissibly invade the province of the jury and was permissible under our rule as articulated in *Singh*.

We conclude that none of the individual statements made by the state's attorney during the examination of witnesses and during closing arguments were improper. As such, we do not need to consider the second stage of our progression for analyzing claims of prosecutorial misconduct, that is, whether the combined instances of misconduct deprived the defendant of a fair trial.

## III

### SUPERVISORY POWERS

The defendant's third claim is that this court, pursuant to its supervisory powers, should reverse his conviction in order to redress the repeated and deliberate misconduct of the prosecutor. Specifically, the defendant asserts that the exercise of such supervisory power is appropriate in that the state's attorney in this matter, in addition to the allegations of misconduct in this case, twice has been chastised by the Appellate Court for improprieties, and that, as a result, a reversal of the defendant's conviction is necessary to address this pattern of misconduct.

Having concluded that the state's attorney in the present case did not act improperly during this criminal trial, there is no reason to exercise our supervisory powers to reverse the judgment of conviction.

The judgment is affirmed.

In this opinion the other justices concurred.