# IN RE IVORY W. ET AL.*
## (SC 20624)

Robinson, C. J., and D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The respondent mother appealed from the judgments of the trial court
terminating her parental rights with respect to her minor children, I and
D. The petitioner, the Commissioner of Children and Families, had filed
petitions to terminate the respondent's parental rights after she admitted
that she had sent sexually explicit photographs of I to several persons
and after the children were adjudicated neglected, committed to the
petitioner's custody, and placed in a preadoptive foster home. During
the proceedings on the petitions, the respondent filed four separate
motions for a continuance of the termination proceedings, asserting,
inter alia, that a continuance was required so that she could testify in
defense of the termination of her parental rights without jeopardizing
her fifth amendment right to avoid incriminating herself in connection
with a pending federal criminal proceeding in which she had been
charged with certain federal crimes related to her distribution of the
photographs of I. The trial court granted the first three motions, but
denied the fourth. Following the termination trial, at which the respon-
dent did not testify and the trial court did not draw any adverse inference
against her due to her silence, the court rendered judgments terminating
her parental rights. With respect to both petitions, the court found
that the petitioner proved by clear and convincing evidence that the
respondent had failed to achieve a sufficient degree of personal rehabili-
tation, as required by the applicable statute (§ 17a-112 (j) (3) (B) (i)).
With respect to the petition related to I, the court additionally found
that, as the result of the respondent's conduct in distributing the sexually
explicit photographs of I, I had been denied the care, guidance, or
control necessary for that child's well-being for purposes of § 17a-112
(j) (3) (C). The court further found that the petitioner had established
that the seven factors set forth in § 17a-112 (k) weighed in favor of
terminating the respondent's parental rights and that doing so was in
the children's best interests. On appeal, the respondent claimed, inter
alia, that her right to due process was violated when the trial court

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.

In re Ivory W.

denied her fourth motion for a continuance pending the conclusion of the federal criminal proceeding. *Held*:

1. The respondent was not deprived of her due process rights under the federal and state constitutions by virtue of the trial court's denial of her motion for a continuance of the termination proceeding:

   a. The trial court correctly determined that it was not required to grant the respondent's motion for a continuance under the due process clause of the fourteenth amendment to the United States constitution: this court clarified that the specific analytical framework of the United States Supreme Court's "penalty" cases, in which that court concluded that certain penalties for remaining silent are severe enough to constitute compulsion to speak and violate the fifth amendment privilege against self-incrimination, governed this court's analysis; in the present case, the respondent did not suffer an automatic severe penalty, or even the penalty of an adverse inference, as a direct consequence of her decision not to testify at the termination proceeding, because the trial court's judgments terminating her parental rights were based exclusively on the petitioner's clear and convincing evidence that, with respect to both children, the respondent had failed to rehabilitate and that, with respect to I specifically, that child had been denied the care, guidance, or control necessary for her well-being, and the respondent was not prevented from presenting evidence in her own defense; moreover, the respondent did not cite to any case in which a court had concluded that, when the interests at stake in a civil proceeding are sufficiently important, such as in the respondent's termination proceeding, the frustration of an individual's desire to testify in his or her own defense as a result of the individual's choice to invoke the fifth amendment is a sufficiently severe penalty to constitute compulsion under the fifth amendment.

   b. The respondent could not prevail on her claim that the trial court had violated her due process rights under the state constitution (art. I, §§ 8 and 10) when it denied her motion for a continuance; this court considered the factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing state constitutional provisions and concluded that none of those factors supported the respondent's claim, as federal and state case law did not favor the respondent's position, the respondent had not explained why, under the specific circumstances of this case, the text of article first, §§ 8 and 10, warranted a broader reading, it was against public policy to allow children to remain in foster care for lengthy periods without achieving permanency, and, although the fundamental right of parents to raise their children had deep roots in Connecticut history and is entitled to heightened due process protections, it did not necessarily follow that the state constitution provided broader protections with respect to the right to family integrity than the federal constitution.

2. The trial court did not abuse its discretion in denying the respondent's motion for a continuance: it was not unreasonable for that court to conclude that the interests of the children and the petitioner in having

In re Ivory W.

the matter resolved as soon as reasonably possible outweighed the respondent's interest in postponing the matter so that she could testify because, although granting the continuance would have allowed the respondent to testify in her own defense at a proceeding involving her fundamental liberty interest in parenting her children, that consideration had to be weighed against the countervailing facts that, at the time the respondent filed her motion, she had previously filed three motions for a continuance, which the trial court granted, the termination of parental rights trial already had been delayed for eighteen months, the children, who were then five and seven years old, had been in the petitioner's custody for more than three years and in a preadoptive foster home for more than two years, and the respondent sought an indefinite postponement, all of which impacted the children's important need for permanency; moreover, although the respondent contended that the children's needs were entitled to little or no weight because, at the time she filed her fourth motion for a continuance, the children were thriving in their foster home and presumably would have continued to do so during the period that the trial was delayed, a sense of permanency is crucial to a child's welfare, and delaying the trial indefinitely would have resulted in keeping the respondent's very young children in a state of limbo indefinitely; furthermore, it was not unreasonable for the court to consider the seriousness of the neglect allegations and the weight of the evidence supporting them in determining whether to grant the motion for a continuance, and, in the absence of any offer of proof as to the substance of the testimony that the respondent would have presented if a continuance were granted or any claim that her testimony could affect the outcome of the termination proceeding, the trial court was not required to grant the motion.

3. This court declined to exercise its supervisory authority over the administration of justice to require trial courts to grant a respondent's motion for a continuance of a termination of parental rights proceeding whenever the respondent has invoked his or her fifth amendment privilege against self-incrimination in connection with a related criminal proceeding, as such a rule was not required to ensure the fairness and integrity of the judicial system and would deprive trial courts of their ability to consider the fairness of their rulings by eliminating their discretion.

Argued December 13, 2021—officially released March 31, 2022**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior

---

** March 31, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

In re Ivory W.

Court in the judicial district of Middlesex, Juvenile Matters at Middletown, where the court, *Sanchez-Figueroa, J.*, denied the respondent mother's motion for a continuance; thereafter, the case was tried to the court, *Sanchez-Figueroa, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed. *Affirmed.*

*Dana M. Hrelic*, with whom were *Johanna S. Katz* and, on the brief, *Michael S. Taylor*, for the appellant (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Frank LaMonaca*, *Nisa Khan*, and *Jillian Hira*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

KELLER, J. The primary issue before us in this appeal is whether the trial court violated the constitutional due process rights of the respondent mother, Amber F.,[1] when it denied her motion for a continuance of the trial on petitions to terminate her parental rights pending the conclusion of a related criminal proceeding on the ground that she could not testify in her own defense in the termination proceeding without jeopardizing her fifth amendment right to avoid incriminating herself in the criminal proceeding. The petitioner, the Commissioner of Children and Families, filed these petitions to terminate the respondent's parental rights with respect to her children, Ivory W. and Darrick B., after the respondent admitted that she had sent explicitly sexual photographs of Ivory W. to several persons, including an individual who was a registered sex offender. The respondent was indicted in federal court on charges of distributing child pornography on the basis of the same conduct. During the proceedings on the petitions,

_____
[1] We hereinafter refer to Amber F. as the respondent.

In re Ivory W.

the respondent filed four motions for a continuance of the trial, contending, among other things, that a continuance was required so that she could testify in defense of the termination of her parental rights without jeopardizing her fifth amendment right to avoid incriminating herself in the criminal proceeding. The trial court granted the first three motions, but denied the last one. After the trial, the trial court rendered judgments terminating the respondent's parental rights.[2] This appeal followed.[3]

The respondent claims that the trial court's denial of her motion for a continuance violated her due process right to present a defense to the termination of her parental rights under the federal and state constitutions. The respondent further claims that, if this court determines that the denial of her motion for a continuance was constitutional, the denial was an abuse of discretion. Finally, the respondent claims that, if this court determines that the denial of her motion for a continuance was neither unconstitutional nor an abuse of discretion, this court should exercise its supervisory authority over the administration of justice to direct our trial courts to grant motions for a continuance of termination of parental rights proceedings whenever related criminal proceedings against the parent are pending. We reject the respondent's claims and affirm the judgments of the trial court.

The record reveals the following relevant procedural history and facts. On October 2, 2017, the Department of Children and Families (department) received a referral from the Hartford Police Department indicating that it

---

[2] The trial court also terminated the parental rights of Ivory's father, David W., and Darrick's father, Darrick B. Neither father has participated in this appeal.

[3] The respondent appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

had received a report from an individual that he had received sexually explicit photographs of a child from the respondent. The individual reported that he had met the respondent on a dating website and that they had been having explicit sexual conversations with each other for several days. On this particular day, the respondent had sent him photographs of her breasts and her vagina. In addition, the respondent had sent him photographs showing the vagina of a child, later determined to be Ivory, who was then four years old. The individual reported the matter because he was a registered sex offender and was worried that he might be criminally implicated.

On October 3, 2017, a social worker and a social work investigator employed by the department and several Meriden police detectives went to the respondent's residence in response to the referral. The respondent admitted to them that she had sent photographs of Ivory's vagina to multiple persons by cell phone. The respondent also indicated that she had photographs of then two year old Darrick's genitalia on her cell phone but denied sharing them with anyone.

During the October 3, 2017 visit, the social worker observed that the respondent's residence was extremely dirty and unkempt. The floors were dirty, and there were overflowing garbage bags on the kitchen floor, causing a strong odor to permeate the apartment, and bugs crawling on the countertops, walls, and ceiling. The children also were dirty and had a strong odor.

On October 12, 2017, the petitioner filed ex parte motions for orders of temporary custody and neglect petitions on behalf of Ivory and Darrick, which the trial court granted. On October 20, 2017, the court sustained the orders of temporary custody at a hearing at which the respondent appeared and ordered preliminary spe-

In re Ivory W.

cific steps to be taken by the respondent to regain custody of her children.

On January 23, 2018, the court adjudicated the children neglected and committed them to the care and custody of the petitioner. The respondent entered a plea of nolo contendere and did not contest the commitment. The court also ordered final specific steps[4] and a psychological examination of the respondent.

After the initial removal of the children, the department referred the respondent to a licensed clinical social worker for individual therapy. The respondent was discharged within two weeks for failing to comply with the therapist's cancellation policy. When the department subsequently referred the respondent to another service provider for individual therapy and a psychosexual evaluation in accordance with the court-ordered specific steps, the respondent again missed numerous appointments and was unable to focus during the sessions that she did attend. She was therefore discharged from that treatment program.

On August 30, 2018, the trial court conducted a hearing on the petitioner's proposal for a permanency plan of termination of parental rights and adoption for the children.[5] Although the respondent did not agree with the plan, she indicated through counsel that she was reserving her defenses for trial. After reviewing the department's social study in support of the plan, the

---

[4] Among other things, the trial court ordered the respondent to keep appointments with and to cooperate with the department, to participate in counseling and to make progress toward treatment goals, including learning to make better choices for herself and her children, to cooperate with a specified service provider for parenting counseling, to cooperate with court-ordered evaluations or testing, and to sign releases allowing the department to communicate with service providers to check on her attendance, cooperation, and progress toward identified goals.

[5] The petitioner was required, pursuant to General Statutes § 46b-129 (k) (1) (A), to submit a permanency plan for the children nine months after their removal from the respondent's custody.

In re Ivory W.

court, on that same date, approved the permanency plan, finding that it would be in the best interests of the children. On December 7, 2018, the children were placed in a preadoptive foster home.

Later that month, on December 12, 2018, the petitioner filed petitions seeking to terminate the respondent's parental rights as to Ivory and Darrick. Both petitions alleged that the children had been found to have been neglected, abused, or uncared for in a prior proceeding and that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible position in the life of her children. See General Statutes § 17a-112 (j) (3) (B) (i). The petition regarding Ivory also alleged that she had been denied the care, guidance, or control necessary for her physical, educational, moral, or emotional well-being by reason of the respondent's acts of commission, including sexual exploitation.[6] See General Statutes § 17a-112 (j) (3) (C). The trial court scheduled a trial on the termination petitions for May, 2019. Meanwhile, in December, 2018, the respondent was indicted in federal court on charges of engaging in sexually explicit conduct for the purposes of producing sexually explicit images of children that were then transmitted to others in violation of 18 U.S.C. § 2251 (a)[7] and distributing child pornography in violation of 18 U.S.C. § 2252A (a) (2).[8]

---

[6] Pursuant to General Statutes § 46b-129 (k) (6), the petitioner was required to file a petition for termination of parental rights not later than sixty days after the trial court approved the permanency plan of adoption.

[7] Section 2251 (e) of title 18 of the 2018 edition of the United States Code provides in relevant part: "Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than [fifteen] years nor more than [thirty] years . . . ."

[8] Section 2252A (b) (1) of title 18 of the 2018 edition of the United States Code provides in relevant part: "Whoever violates, or attempts or conspires to violate, paragraph (1), (2), (3), (4), or (6) of subsection (a) shall be fined under this title and imprisoned not less than [five] years and not more than [twenty] years . . . ."

In re Ivory W.

Three days before the scheduled trial date, the respondent's counsel filed a motion to withdraw and a motion for a continuance to allow the court to appoint new counsel. The court granted both motions. Two months later, on July 18, 2019, the trial court again approved the permanency plan of termination of parental rights and adoption on the basis of an updated social study from the department.[9] The court rescheduled trial for August, 2019.

One week before the August, 2019 trial date, the respondent filed a second motion for a continuance in which she requested that the court reschedule the trial to a date after her criminal trial, which, according to the respondent, was scheduled for November, 2019. The respondent contended that the continuance was necessary so that she could testify in her own defense at the termination proceeding, as required by due process, while preserving her fifth amendment privilege against self-incrimination in connection with the criminal proceeding. The petitioner objected to the motion on the ground that it was unclear when the criminal trial would take place and that it would be detrimental to the children, who had been in foster care nearly two years, to delay a final disposition. The children's attorney also objected to the motion for a continuance out of concern that the children required permanency. The trial court initially denied the motion but, upon the respondent's motion for reconsideration, reversed itself, granted the motion, and rescheduled the trial for December 10, 2019.

On December 6, 2019, the respondent moved for a third continuance on the same ground as that asserted in the previous motion. The trial court granted the motion but indicated that it would not entertain any

_____

[9] Pursuant to General Statutes § 46b-129 (k) (1) (A), the petitioner must file a motion for review of a permanency plan nine months after the initial plan has been approved.

further continuance requests. The court ultimately scheduled the trial for June 9, 2020. The trial was postponed, however, because of the COVID-19 pandemic, as was the criminal proceeding in federal court, and the trial court scheduled a new trial date of January 5, 2021. During that delay, the court approved for a third time the permanency plan of termination of parental rights and adoption for the children. The children's attorney indicated that she agreed with the permanency plan and that she thought that it was in the best interests of the children, noting in her court filing that the children were "comfortable and happy" in their foster home, they had become part of the family, and they wanted "the case to be closed so people do not have to ask them questions all the time." She also noted that the "trial ha[d] been scheduled/pending for about [one] year, and it [was] in the best interest[s] of the children to schedule the trial as soon as possible."

On December 30, 2020, the respondent filed a fourth motion for continuance in which she contended that her federal criminal trial had been continued indefinitely due to the COVID-19 pandemic, that she was prohibited from using any computer devices, making her ability to participate in a remote trial extremely difficult, and that her counsel required additional time to ensure that the respondent could participate. The trial court denied the respondent's motion and proceeded with the trial. By that time, the children had been in the petitioner's custody for more than three years and in the preadoptive foster home for more than two years.

At the outset of the trial on January 5, 2021, the trial court advised the respondent of her rights, including her right to testify "to tell [her] side of the story to the court . . . ." The court warned the respondent, however, that, if she chose not to testify, the court could draw an adverse inference against her. The petitioner's

In re Ivory W.

counsel then indicated that he did not intend to request an adverse inference if the respondent declined to testify, and the court ultimately did not draw any adverse inference against the respondent due to her silence.

After the advisement, the respondent's counsel renewed the respondent's objection to proceeding with the trial while her criminal case was pending. Counsel reiterated that doing so would either violate the respondent's due process rights if she declined to testify in order to preserve her fifth amendment rights in the criminal proceeding or jeopardize her fifth amendment rights if she chose to testify. The trial court noted the objection and proceeded with the trial.

At trial, a department investigator testified that the respondent had confirmed to the investigator, at the time that the children were removed from the respondent's custody, that she had distributed pornographic photographs of Ivory. Other evidence established that the respondent admitted to federal agents and Meriden police detectives that she had taken sexually explicit photographs of Ivory and sent them to multiple men over the Internet. The petitioner also presented evidence that the respondent had failed to comply with her specific steps, including the requirement that she sign releases allowing the department to communicate with service providers to monitor her attendance, cooperation, and progress toward identified goals. Specifically, the respondent refused to sign a release allowing the department to communicate with a therapist with whom she claimed to have been in treatment since 2018. In addition, the petitioner presented evidence that the children remained in the preadoptive foster home where they had been placed at the end of 2018 and that they were doing well there. The respondent did not testify at trial, but she presented a stipulation of fact specifying the criminal charges that were pending against her in federal court and a handwritten statement in which she

In re Ivory W.

stated that she loved her children.[10] She called no witnesses.

In its memorandum of decision, the trial court found with respect to both termination petitions that the petitioner had proved by clear and convincing evidence that the respondent had failed to rehabilitate for purposes of § 17a-112 (j) (3) (B) (i). In addition, with respect to the termination petition related to Ivory, the court found that, as the result of the respondent's conduct in distributing sexually explicit photographs of Ivory, the child had been denied the care, guidance, or control necessary for her well-being for purposes of § 17a-112 (j) (3) (C). The court further found that the petitioner had established that the seven factors set forth in § 17a-112 (k)[11] weighed in favor of terminating the respondent's

---

[10] In the written statement, the respondent did not address her responsibility for the conduct that was the subject of the pending criminal charges.

[11] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the

In re Ivory W.

parental rights and that doing so was in the best interests of the children. Accordingly, the court granted the petitions for termination of the respondent's parental rights.

Several weeks after the trial court issued its memorandum of decision, the respondent pleaded guilty in federal court to charges of distributing child pornography in violation of 18 U.S.C. § 2252A (a) (2). After the plea, she was remanded to federal detention, and, at sentencing, she faced a "binding incarceration range" of sixty to ninety months. This appeal followed.

The respondent claims that (1) the trial court deprived her of her due process right to a fair trial under both the federal and state constitutions when it denied her motion for a continuance of the termination of parental rights proceeding until the conclusion of the criminal proceeding, (2) if this court determines that the trial court did not violate her constitutional rights, the trial court abused its discretion when it denied the motion for a continuance, and (3) if this court determines that the trial court neither deprived her of her due process rights nor abused its discretion, this court should exercise its supervisory authority to require our trial courts to grant motions for a continuance in termination of parental rights proceedings when related criminal charges against the parent are pending. We reject all of these claims and affirm the judgments of the trial court.

I

We first address the respondent's claim that the trial court deprived her of her due process right to a fair trial under the federal and state constitutions when it denied her motion for a continuance of the termination of parental rights proceeding until the conclusion of the

unreasonable act of any other person or by the economic circumstances of the parent.''

In re Ivory W.

federal criminal proceeding. Specifically, the respondent contends that the denial of her motion for a continuance unconstitutionally "precluded [her] from presenting a defense to the termination petition[s] because she was forced to exercise her [fifth amendment privilege against self-incrimination] in light of the concurrently pending criminal charges." We conclude that the respondent was not deprived of her due process rights under either the federal or the state constitution.

A

We begin with the respondent's claim under the federal constitution. This claim presents a question of law over which our review is plenary. See, e.g., *State* v. *Collymore*, 334 Conn. 431, 477, 223 A.3d 1, cert. denied, U.S. , 141 S. Ct. 433, 208 L. Ed. 2d 129 (2020).

At the outset, we review the governing constitutional principles. It is well established that "[t]he fifth amendment[12] privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, [when] the answers might incriminate him in future criminal proceedings." (Footnote added; internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 634, 847 A.2d 883 (2004). Although a defendant has the right to refuse to testify in a civil proceeding when doing so might be incriminatory, "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his [f]ifth [a]mendment privilege." *Keating* v. *Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir.), cert.

---

[12] The fifth amendment privilege against self-incrimination is applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

In re Ivory W.

denied, 516 U.S. 827, 116 S. Ct. 94, 133 L. Ed. 2d 49 (1995); see also *McKune* v. *Lile*, 536 U.S. 24, 41, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002) ("[a]lthough a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the [c]onstitution does not by that token always forbid requiring him to choose" (internal quotation marks omitted)); *Tyler* v. *Shenkman-Tyler*, 115 Conn. App. 521, 526–27, 973 A.2d 163 ("[s]o long as the defendant is neither forced to exercise nor prevented from exercising his right to testify, the right to present a defense is not burdened by the strategic choice or resulting adverse consequences" (internal quotation marks omitted)), cert. denied, 293 Conn. 920, 979 A.2d 493 (2009); *State* v. *Easton*, 111 Conn. App. 538, 543, 959 A.2d 1085 (2008) ("[t]he fact that the defendant had to make a difficult choice between [his fifth amendment right not to incriminate himself and his due process right to testify in his own defense] does not deprive him of due process"), cert. denied, 290 Conn. 916, 965 A.2d 555 (2009). Put another way, the fact that there may be adverse consequences when a defendant invokes the fifth amendment in a civil proceeding does not necessarily mean that the defendant is subject to unlawful compulsion for fifth amendment purposes. See *McKune* v. *Lile*, supra, 31, 45 (when inmate convicted of rape refused to sign admission of guilt form as condition of participating in sexual abuse treatment program on ground that doing so could lead to charges of perjury, resulting reduction of inmate's privileges and his transfer to facility with poorer living conditions did not constitute compulsion for fifth amendment purposes); *Baxter* v. *Palmigiano*, 425 U.S. 308, 317–18, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) (when prison disciplinary board drew adverse inference from inmate's invocation of fifth amendment rights at disciplinary proceeding, board's action did not constitute "an invalid attempt by the [s]tate to compel

In re Ivory W.

testimony''). Accordingly, ''the [c]onstitution . . . does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.'' (Internal quotation marks omitted.) *Kashi* v. *Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986); accord *Securities & Exchange Commission* v. *Dresser Industries, Inc.*, 628 F.2d 1368, 1375 (D.C. Cir.), cert. denied, 449 U.S. 993, 101 S. Ct. 529, 66 L. Ed. 2d 289 (1980); see also *United States Commodity Futures Trading Commission* v. *A.S. Templeton Group, Inc.*, 297 F. Supp. 2d 531, 534 (E.D.N.Y. 2003) (''[e]ven [when] there are parallel criminal and civil proceedings, a defendant [ordinarily] has no constitutional right to a stay pending the outcome of a related criminal case''); *State* v. *Easton*, supra, 111 Conn. App. 543 (trial court did not violate defendant's due process rights by conducting probation and drug dependency hearings before defendant's trial on related pending criminal charge).

There are limits, however, to the general rule that an individual constitutionally may be required to choose between accepting the consequences of testifying at a civil trial—namely, the potential for self-incrimination— and accepting the consequences of invoking his or her fifth amendment right to remain silent. The United States Supreme Court has held that ''a [s]tate may not impose *substantial* penalties because a witness elects to exercise his [f]ifth [a]mendment right not to give incriminating testimony against himself.'' (Emphasis added.) *Lefkowitz* v. *Cunningham*, 431 U.S. 801, 805, 97 S. Ct. 2132, 53 L Ed. 2d 1 (1977); see also *In re Samantha C.*, supra, 268 Conn. 662 (''certain *severe* penalties may not be imposed as the cost of asserting one's constitutional fifth amendment privilege to remain silent'' (emphasis added)). Thus, ''one cannot answer the question whether [a] person has been compelled to incriminate himself without first considering the sever-

In re Ivory W.

ity of the consequences.''[13] *McKune* v. *Lile*, supra, 536 U.S. 44.

''[T]here have been several instances in which the [United States Supreme Court] has held that certain penalties, even those outside the criminal context, are severe enough to constitute compulsion to speak. See, e.g., *Lefkowitz* v. *Cunningham*, [supra, 431 U.S. 806] (scheme under which elected [political party] official who chose to remain silent at grand jury proceedings was automatically removed from office [and barred from holding office for five years] violated privilege against self-incrimination); *Lefkowitz* v. *Turley*, 414 U.S. 70, 82–83, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973) (scheme under which contractor who remained silent at grand jury proceeding was [automatically] disqualified from transacting with state violated privilege against self-incrimination); *Uniformed Sanitation Men Assn., Inc.* v. *Commissioner of Sanitation*, 392 U.S. 280, 284–85, 88 S. Ct. 1917, 20 L. Ed. 2d 1089 (1968) (scheme under which state workers' refusal to sign waivers of immunity automatically resulted in termination of employment violated privilege against self-incrimination); *Gardner* v. *Broderick*, 392 U.S. 273, 279, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968) (same); *Spevack* v. *Klein*, 385 U.S. 511, 514, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967) (scheme under which attorney was disbarred for remaining silent [during disciplinary proceeding] violated privilege against self-incrimination); *Garrity* v. *New Jersey*, 385 U.S. 493, 497–98, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967) (police officers' statements were compelled and, therefore, inadmissible against them because officers would have been [automatically] termi-

_____

[13] Although an individual who has been severely penalized for exercising the privilege against self-incrimination has not, in a literal sense, been compelled to speak, the cases addressing this issue treat the imposition of a severe penalty for exercising that privilege and being compelled to speak as equivalent for purposes of analyzing the constitutionality of the state action at issue.

In re Ivory W.

nated had they remained silent). These cases, also known as the penalty cases; *McKune* v. *Lile*, supra, 536 U.S. 50 (O'Connor, J., concurring); stand for the proposition that certain significant losses, even those financially oriented and noncriminal in nature, may nonetheless be severe enough to compel one to speak within the meaning of the fifth amendment.'' (Internal quotation marks omitted.) *In re Samantha C.*, supra, 268 Conn. 661–62.

In the present case, the respondent contends that the consequence that she incurred as the result of the trial court's denial of her motion for a continuance–namely, her inability to testify in her own defense at the termination of parental rights proceeding—was at least as severe a penalty as any of those at issue in the penalty cases. She points out that ''[t]he rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and [r]ights far more precious . . . than property rights. It is cardinal with [the United States Supreme Court] that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. The integrity of the family unit has found protection in the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment, the [e]qual [p]rotection [c]lause of the [f]ourteenth [a]mendment, and the [n]inth [a]mendment.'' (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983), quoting *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). Moreover, ''[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate. . . . When the [s]tate moves to destroy weakened familial bonds, it must provide the parents

with fundamentally fair procedures.'' *Santosky* v. *Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The respondent contends that, because her fundamental constitutional right to raise her children is at least as important as any of the rights at issue in the penalty cases, the trial court's denial of her motion for a continuance of the termination proceeding pending the conclusion of the criminal proceeding so that she could testify at the termination proceeding without incriminating herself was unconstitutional.

Before addressing the merits of the respondent's claim, we pause to clarify the analytical framework that applies to it. The respondent frames her claim as implicating her due process right to present a defense and asks this court to apply the analysis developed in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), in which the United States Supreme Court "established a three part test to determine whether the actions of the court violated a party's right to procedural due process.''[14] *Foster* v. *Foster*, 84 Conn. App. 311, 319, 853 A.2d 588 (2004). We agree with the respondent that her claim implicates due process concerns as the "flip side'' of the fifth amendment concerns implicated by compelled self-incrimination. See *Tyler* v. *Shenkman-Tyler*, supra, 115 Conn. App. 526 (applying due process analysis to defendant's claim that his invocation of fifth amendment privilege prevented him from testifying at dissolution trial); see also *State* v. *Kirby*, 280 Conn.

___

[14] "The three factors to be considered are (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens attendant to increased or substitute procedural requirements. . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures.'' (Citation omitted; internal quotation marks omitted.) *Foster* v. *Foster*, supra, 84 Conn. App. 319.

In re Ivory W.

361, 403, 908 A.2d 506 (2006) ("[a] defendant has a right under the compulsory process [clause of the sixth amendment] and due process [clause] to present [his] version of the facts as well as the prosecution's to the jury so [that] it may decide where the truth lies" (internal quotation marks omitted)); *State* v. *Easton*, supra, 111 Conn. App. 541 ("The right to testify on one's own behalf at a criminal trial has sources in several provisions of the [c]onstitution. It is one of the rights that are essential to due process of law in a fair adversary process." (Internal quotation marks omitted.)). It is clear to us, however, that the dispositive issue before us is whether the consequences of the respondent's invocation of her privilege against self-incrimination were sufficiently severe to constitute compulsion for purposes of the fifth amendment. See *McKune* v. *Lile*, supra, 536 U.S. 44 ("one cannot answer the question whether [a] person has been compelled to incriminate himself without first considering the severity of the consequences"). In other words, if the respondent can establish that the consequence that she incurred for invoking the fifth amendment was as severe a penalty as those imposed in the penalty cases, she would thereby establish that the trial court's denial of her motion for a continuance unconstitutionally deprived her of her due process right to testify in her own defense. Accordingly, we conclude that the specific analytical framework of the penalty cases governs our analysis, rather than the more general procedural due process standard set forth in *Mathews* v. *Eldridge*, supra, 424 U.S. 335.

In addressing the question of whether the consequences of the respondent's invocation of the fifth amendment at the termination proceeding were sufficiently severe that the trial court was constitutionally required to grant her motion for a continuance pending the resolution of the criminal proceeding, we do not write on a blank slate. In *In re Clark K.*, 70 Conn. App.

In re Ivory W.

665, 799 A.2d 1099, cert. denied, 261 Conn. 925, 806 A.2d 1059 (2002), the Appellate Court addressed the respondent's claim that the trial court should not have proceeded with the termination of parental rights hearing while related criminal charges were pending because her invocation of the fifth amendment "prevented her from fully explaining her actions . . . ." Id., 673. The Appellate Court rejected this claim, concluding, in a somewhat cursory opinion, that, having chosen to remain silent at the termination of parental rights proceeding, the respondent could not then "complain that there was not a full and fair hearing based on the premise that she, herself, did not tell her side of the story." Id., 674.

In *In re Samantha C.*, supra, 268 Conn. 614, this court considered the respondents' claim that the trial court had improperly drawn an adverse inference from their refusal to testify at the termination of parental rights proceeding pursuant to Practice Book (2001) § 34-1 (f), which provided in relevant part that "[n]o parent . . . shall be compelled to testify [at a termination of parental rights proceeding] if the testimony might tend . . . to establish the validity of the facts alleged in the petition."[15] See id., 633–34. The respondents contended that, "because the fifth amendment forbids an adverse inference to be drawn against a criminal defendant for electing not to testify, [Practice Book (2001)] § 34-1 (f)

[15] Practice Book (2001) § 34-1 (f) "was [adopted] in order to implement [General Statutes] § 46b-137 (b) [now § 46b-137 (d)] . . . ." *In re Samantha C.* supra, 268 Conn. 647. General Statutes (Rev. to 2003) § 46b-137 (b) provides: "Any confession, admission or statement, written or oral, made by the parent or parents or guardian of the child or youth after the filing of a petition alleging such child or youth to be neglected, uncared-for or dependent, shall be inadmissible in any proceeding held upon such petition against the person making such admission or statement unless such person shall have been advised of his right to retain counsel, and that if he is unable to afford counsel, counsel will be appointed to represent him, that he has a right to refuse to make any statement and that any statements he makes may be introduced in evidence against him."

In re Ivory W.

similarly forbade an adverse inference to be drawn
. . . .'' Id., 657. Addressing the respondents' claim that
the drawing of an adverse inference constituted com-
pulsion, this court observed that termination of parental
rights decrees do not fit neatly into either the category
of cases in which courts have held that it is not unconsti-
tutional to force an individual to choose between invok-
ing his fifth amendment right or testifying at a civil
proceeding or the category of penalty cases in which
courts have held that, when the consequences of invok-
ing the fifth amendment at a civil proceeding are suffi-
ciently severe, they constitute unconstitutional com-
pulsion. See id., 662. On the one hand, this court
observed that, unlike the consequences at issue in the
penalty cases, ''termination of parental rights proceed-
ings are not designed to *punish* parents, but to *protect*
children.'' (Emphasis in original.) Id., 662–63. On the
other hand, this court recognized that ''the penalty that
necessarily comes with a termination decree is arguably
as severe as the penalties at issue in the penalty cases,
for instance, the loss of one's employment.'' (Internal
quotation marks omitted.) Id., 663. This court concluded
that, ''[u]nder the [United States] Supreme Court's prec-
edent . . . the respondents arguably might have had a
right to be free from adverse inferences had they
asserted their right not to testify *under the fifth amend-
ment*.'' (Emphasis in original.) Id. Because the respon-
dents had not done so, but had relied only ''on a rule
of practice derived from our state's already prophylactic
body of juvenile law,'' this court did not answer the
question of whether the respondents' constitutional
rights would have been violated if they had invoked the
fifth amendment at trial. Id., 663–64.

In the present case, the respondent contends that *In
re Samantha C.* supports the proposition that, when a
respondent in a termination of parental rights proceed-
ing *has* invoked her fifth amendment right not to testify

In re Ivory W.

at trial—as the respondent here did—courts should find that the consequences of the respondent's choice are sufficiently severe to amount to unconstitutional compulsion under the penalty cases. She further contends that *In re Clark K.* was wrongly decided because "[i]t is flatly at odds" with both the penalty cases and *In re Samantha C.* We are not persuaded.

Although this court in *In re Samantha C.* acknowledged the compelling "interest in remaining the parent of one's children"; *In re Samantha C.*, supra, 268 Conn. 663; we also observed in dictum that "[t]hat does not necessarily mean . . . that suffering an adverse inference in a termination proceeding is . . . unconstitutional under the penalty cases, because those cases involved an *automatic*, *direct penalty* resulting from the assertion of the constitutional privilege against self-incrimination; whereas . . . the penalty of an adverse inference merely added to the weighing process. Put another way, the adverse inference . . . was one of many factors considered by the trier of fact; in the penalty cases, however, the assertion of the fifth amendment privilege was the only factor that led directly to the penalty." (Emphasis added.) Id., 663 n.45; see also *Baxter* v. *Palmigiano*, supra, 425 U.S. 317–18 ("It is . . . undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the [d]isciplinary [b]oard. In this respect, this case is very different from the circumstances before the [c]ourt in the [penalty cases], [in which] refusal to submit to interrogation and to waive the [f]ifth [a]mendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the [s]tate."); *Tyler* v. *Shenkman-Tyler*, supra, 115 Conn. App. 530 n.5 (trial court's denial of motion for continuance of dissolution proceeding pending outcome of criminal proceeding on charges of arson and reckless endangerment arising from destruction by

fire of vacation home owned by defendant's wife did
not violate due process when "the defendant's blanket
refusal to testify at the dissolution trial did not *automatically* result in his forfeiting the outcome of [that] proceeding" (emphasis added)).

In the present case, not only did the respondent not
suffer an automatic severe penalty—the termination of
her parental rights—as a direct consequence of her
refusal to testify, she did not even suffer the penalty
of an adverse inference.[16] Rather, the trial court's judgments terminating the respondent's parental rights were
based exclusively on the petitioner's clear and convincing evidence that, with respect to both children, the
respondent had failed to rehabilitate and that, as the
result of the respondent's conduct in distributing sexually explicit photographs of Ivory, the child had been
denied the care, guidance, or control necessary for her
well-being. Moreover, the respondent was not prevented from presenting evidence in her own defense
and, in fact, did so, albeit somewhat marginally. The
only penalty that the respondent suffered as the result
of her choice to invoke her fifth amendment rights was
her inability to testify in her own defense. Although the
respondent was undoubtedly confronted with a difficult
choice between invoking her fifth amendment rights
and exercising her due process right to testify in her
own defense, she has not cited a single case in which
a court has concluded that, when the interests at stake
in a civil proceeding are sufficiently important, the frustration of an individual's desire to testify in his or her
own defense as the result of the individual's choice
to invoke the fifth amendment, *in and of itself*, is a
sufficiently severe penalty to constitute compulsion

_____

[16] Accordingly, we need not decide whether the trial court would have
violated the respondent's constitutional rights if it had drawn an adverse
inference.

In re Ivory W.

under the fifth amendment.[17] Indeed, several of our sister states have held to the contrary. See *Ex parte K.G.*, Docket Nos. 2200547, 2200548, 2200549, 2200550, 2200551, 2200552 and 2200553, 2021 WL 2878696, *9 (Ala. Civ. App. July 9, 2021) (rejecting claim that trial court violated mother's fifth amendment rights when it denied her motion to stay of termination of parental rights proceeding pending conclusion of related criminal proceedings); *Burkett* v. *Arkansas Dept. of Human Services*, 507 S.W.3d 530, 534 (Ark. App. 2016) (rejecting claim that trial court violated father's fifth amendment rights when it denied his motion to stay termination of parental rights proceeding pending conclusion of related criminal proceedings); *In re D.P.*, 327 Ill. App. 3d 153, 160–61, 763 N.E.2d 351 (2001) (rejecting claim that trial court violated father's fifth amendment rights when it denied his motion for continuance of termination of wardship proceeding pending resolution of related criminal proceeding), appeal denied, 198 Ill. 2d 615, 770 N.E.2d 219 (2002); *In re R.B.*, 832 N.W.2d 375, 379 (Iowa 2013) (rejecting claim that trial court violated father's fifth amendment rights when it denied his motion for continuance of termination of parental rights proceeding pending conclusion of related criminal proceeding when state did not "insist on a course of action that would interfere with the father's right against self-incrimination" and termination of parental rights was supported by ample evidence); *In re C.L.R.*, 211 Mont. 381, 387, 685 P.2d 926 (1984) (rejecting claim that trial court violated father's fifth amendment rights when it

---

[17] The respondent cites a number of state cases holding that, under the federal constitution, a trial court cannot automatically terminate an individual's parental rights exclusively on the basis of the individual's refusal to testify at the termination of parental rights proceeding on fifth amendment grounds. These cases, which we discuss more fully in part I B of this opinion, are distinguishable because the trial court in the present case did not rely on the respondent's failure to testify to support its conclusion that the respondent's parental rights should be terminated.

In re Ivory W.

denied his motion for stay of termination of parental rights proceeding pending conclusion of related criminal proceeding).

These cases find support in the decision of the United States Supreme Court in *McGautha* v. *California*, 402 U.S. 183, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971), in which the defendant contended that the due process clause of the fourteenth amendment required the state of Ohio to bifurcate his capital felony trial into a guilt phase and a punishment phase. Id., 210–11. Specifically, the defendant contended that, under the "single-trial procedure, he could remain silent on the issue of guilt only at the cost of surrendering any chance to plead his case on the issue of punishment." Id., 211. The United States Supreme Court acknowledged that "[i]t is undeniably hard to require a defendant on trial for his life and desirous of testifying on the issue of punishment to make nice calculations of the effect of his testimony on the jury's determination of guilt." Id., 214. The court observed, however, that the defendant had not been precluded at trial from presenting evidence relevant to the issue of sentencing. Id., 219. The court then stated that, "[a]ssuming that in this case there was relevant information solely within [the defendant's] knowledge, we do not think the [c]onstitution forbids a requirement that such evidence be available to the jury on all issues to which it is relevant or not at all." Id., 220. Accordingly, the court rejected the defendant's claim and concluded that it did not violate due process to require the defendant to choose between (1) testifying in his own defense on the issue of whether his crime warranted the imposition of the death penalty and waiving his fifth amendment right on the issue of guilt, and (2) invoking the fifth amendment to avoid incriminating himself on the issue of guilt and waiving his right to testify on the issue of whether the death penalty was warranted. Id.

In re Ivory W.

The inability to testify in one's own defense on the question of whether the death penalty is warranted is at least as severe a consequence of invoking the fifth amendment as the inability to testify in one's own defense on the issue of whether one's parental rights should be terminated. We therefore reject the respondent's claim that her inability to testify at the termination of parental rights proceeding was a sufficiently severe consequence of invoking her fifth amendment right to constitute compulsion. Accordingly, we conclude that the trial court correctly determined that it was not required to grant her motion for a continuance of the termination proceeding under the due process clause of the fourteenth amendment to the United States constitution.

B

We next address the respondent's claim that the trial court violated the due process provisions of the state constitution; see Conn. Const. art. I, §§ 8,[18] and 10;[19] when it denied her motion for a continuance of the termination of parental rights proceeding pending the conclusion of the criminal proceeding in federal court.[20] We disagree.

[18] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[19] Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[20] The respondent concedes that she did not raise this claim in the trial court and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, it is well settled that a defendant may prevail on an unpreserved claim when: '(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate

342 Conn. 692 APRIL, 2022 719

In re Ivory W.

It is well established that "federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 546, 4 A.3d 1176 (2010). When the claimed state constitutional right "is absent from the plain text of our constitution, we must employ [t]he analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum . . . ." (Internal quotation marks omitted.) Id.

"In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we enumerated the following six factors to be considered in construing the state constitution: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. . . .

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party . . . can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven.

harmlessness of the alleged constitutional violation beyond a reasonable doubt.' . . . *State* v. *Golding*, [supra, 239–40]; see *In re Yasiel R.*, [supra, 781] (modifying third prong of *Golding*)." *State* v. *McClain*, 324 Conn. 802, 809 n.5, 155 A.3d 209 (2017). We conclude that the conditions for reviewability of the respondent's claim under the state constitution are met.

In re Ivory W.

. . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only persuasive decisions.'' (Internal quotation marks omitted.) *Feehan* v. *Marcone*, 331 Conn. 436, 449, 204 A.3d 666, cert. denied,     U.S.    , 140 S. Ct. 144, 205 L. Ed. 2d 35 (2019).

Relying on the same federal cases that she relied on in support of her claim under the federal constitution, the respondent contends that the first *Geisler* factor weighs in her favor. The respondent does not explain why, however, if we conclude that the federal cases on which she relies do *not* support her claim under the federal constitution—which we do—the same cases should nonetheless support her claim under the state constitution. We further note that, to the extent that the respondent relies on the cases recognizing that parents have a fundamental liberty interest in family integrity under the federal constitution, it is well established that ''[t]here are . . . limitations on . . . parental rights. Some of these limitations arise out of an appreciation of the state's long recognized interests as parens patriae. See *Reno* v. *Flores*, 507 U.S. 292, 303–304, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993); *Santosky* v. *Kramer*, [supra, 455 U.S. 766]; *Parham* v. *J. R.*, 442 U.S. 584, 605, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979); *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); see also General Statutes § 10-204a (requiring parents to immunize children prior to school enrollment); General Statutes §§ 14-100a [and] 14-272a (requiring child restraint in vehicles); General Statutes § 17a-81 (authorizing emergency medical treatment [when] parent withholds consent); General Statutes §§ 31-23 [and] 31-24 (restricting child labor from certain occupations or workplaces); General Statutes § 53-21a

In re Ivory W.

(prohibiting parents from leaving child unsupervised in public accommodation or vehicle). Furthermore, it is unquestionable that in the face of allegations that parents are unfit, the state may intrude [on] a family's integrity.'' *Roth* v. *Weston*, 259 Conn. 202, 224, 789 A.2d 431 (2002). These cases support the view that any intrusion on the respondent's parental rights resulting from her choice to invoke the fifth amendment does not rise to the level of a federal constitutional violation. We conclude, therefore, that this factor weighs in favor of the petitioner.

With respect to the second factor—the text of the state constitutional provisions—although the respondent rightly points out that we *can* construe the text of our state constitutional due process provisions as providing broader protections than the due process provision of the fourteenth amendment; see, e.g., *In Re Taijha H.-B.*, 333 Conn. 297, 327 n.20, 216 A.3d 601 (2019); she has not explained why, under the specific circumstances of the present case, the text of either article first, § 8, or article first, § 10, warrants a broader reading. To the extent that she contends that the open courts provision of article first, § 10, which has no analogue in the federal constitution, is *inherently* broader than the federal constitution, we are not persuaded by her conclusory argument that requiring her to choose between her fifth amendment privilege against self-incrimination and her due process right to testify at the termination proceeding denied her access to the courts within the meaning of that provision.[21] We conclude,

---

[21] "Article first, § 10, [of the Connecticut constitution] has been viewed as a limitation [on] the legislature's ability to abolish [common-law] and statutory rights that existed in 1818, when article first, § 10, was adopted, and which were incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury . . . . Therefore, [when] a right existed at common law or by statute in 1818 and became incorporated into the Connecticut constitution by the adoption of article first, § 10, the legislature may restrict or abolish such incorporated right only [when] it provides a reasonable alternative to the enforcement of such right." (Citations omitted; internal quotation marks omitted.) *Ecker*

In re Ivory W.

therefore, that this factor does not support the respondent's claim.

With respect to the third *Geisler* factor, the respondent contends that a review of the intent of our constitutional forebears reveals that they viewed the right to family integrity and the right to personal liberty as indistinguishable. In support of this contention, she points out that Connecticut's earliest extant compilation of statutes, Ludlow's Code of 1650, contained the following language in its introduction: " '[N]o mans life shall bee taken away, no mans honor or good name shall bee stained, no mans person shall be arrested, restrained, banished, dismembered nor any way punished; *no man shall bee deprived of his wife or children*, no mans goods or estate shall bee taken away from him, nor any wayes indamaged, vnder colour of Law or countenance of Authority, vnless it bee by the vertue or equity of some express Law of the Country warranting the same, established by a Generall Courte, and sufficiently published, or in case of the defect of a Law in any perticular case, by the word of God.' " (Emphasis added.) W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 76.

We have no quarrel with the respondent's contention that the fundamental right of parents to raise their children has deep roots in Connecticut history and, like the right to personal liberty, is entitled to heightened due process protections under both the federal and state constitutions. It does not necessarily follow from these facts, however, that the state constitution provides *broader* protections to the right to family integrity than the federal constitution. We note that the United

v. *West Hartford*, 205 Conn. 219, 234, 530 A.2d 1056 (1987). Although we do not rule out the possibility that the provision may have other functions, we cannot conclude that it is implicated every time a litigant has a colorable claim that he or she was deprived of a procedural due process right during trial.

In re Ivory W.

States Supreme Court recognized almost 100 years ago that, for purposes of determining the scope of the due process protections provided by the federal constitution, the right "to marry, establish a home and bring up children" is one of the "privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). The respondent has not provided a detailed historical review of the constitutional right to family integrity under either the federal or the state constitution, and conducting such a review is beyond the scope of this opinion. It is reasonable to assume, however, that the federal constitutional right to family integrity, like the right under the state constitution, can be traced to, among other sources, Connecticut's Ludlow Code, and to earlier English common-law sources that are shared by the Ludlow Code. Thus, in the absence of any evidence to the contrary, it is reasonable to conclude that the right to family integrity under the federal constitution has roots that are as deep as the right under the state constitution.

Moreover, this court previously has recognized that "[t]he privilege against self-incrimination embodied in article first, § 8 [of the Connecticut constitution] has its genesis in the common law. Historically the privilege became part of the common law because of the experience with the oath ex officio as used originally in the ecclesiastical courts and later in the Court of the Star Chamber. 8 [J.] Wigmore, Evidence (McNaughton Rev. [1961]) § 2250. The seemingly innocuous oath which bound a person under examination to make a true answer to all questions that might be asked was used *to force him to destroy himself by his own testimony.* If his compelled testimony convicted him, he was punished. If he refused to take the oath, *he was subjected to torture.*" (Emphasis added.) *State* v. *Asherman*, 193

Conn. 695, 711, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "The purpose of incorporating the privilege in our state constitution was to place this right as it was known at common law beyond legislative abolition." Id., 712. This history supports the view that the purpose of the portion of article first, § 8, providing that "[n]o person shall be compelled to give evidence against himself" was to prohibit the compulsion of self-incriminating punishment by an *immediate, severe, and automatic* punishment, not to prohibit the state from requiring an individual to make a choice between the right to remain silent and the right to testify. Accordingly, we conclude that the third *Geisler* factor does not support the conclusion that the due process provisions of the state constitution are more protective of a parent's due process right to testify at proceedings to terminate parental rights than the due process provision of the fourteenth amendment.

With respect to the fourth *Geisler* factor—persuasive Connecticut precedents—the respondent essentially reiterates her contention under the second *Geisler* factor that our case law supports the notion that the due process provisions of the state constitution *can* provide broader protections than the due process clause of the fourteenth amendment. Having concluded that the second factor does not support the respondent's claim, we reach the same conclusion here.

With respect to the fifth *Geisler* factor—persuasive precedents of other state courts—the respondent cites the following cases in support of her claim: *R.M.* v. *Elmore County Dept. of Human Resources*, 75 So. 3d 1195, 1205 (Ala. Civ. App. 2011) (juvenile court abused its discretion when it denied respondent parents' motions to stay termination proceedings pending conclusion of related criminal proceedings); *In re A.W.*, 231 Ill. 2d 92, 108, 896 N.E.2d 316 (2008) (under federal constitution, "a juvenile court may not compel a parent

In re Ivory W.

to admit to a crime that could be used against him or her in a subsequent criminal proceeding by threatening the loss of parental rights''); *In re A.D.L.*, 133 Nev. 561, 568, 402 P.3d 1280 (2017) (trial court violated respondent mother's federal due process rights when it terminated her parental rights solely because she had refused to admit intentionally abusing child); *In re Amanda W.*, 124 Ohio App. 3d 136, 141, 705 N.E.2d 724 (1997) (state violated parents' rights under federal constitution when it terminated their parental rights for refusing to admit that father sexually abused daughter); *Dept. of Human Services* v. *K.L.R.*, 235 Or. App. 1, 10, 230 P.3d 49 (2010) (''requiring an admission of abuse as a condition of family reunification violates a parent's [f]ifth [a]mendment rights'').

We conclude that none of these cases supports the proposition that requiring a parent to choose between testifying at a termination of parental rights proceeding and invoking his or her right not to testify to avoid self-incrimination is unconstitutional under either the federal or the state constitution. The respondent's reliance on *R.M.* is misplaced because the court in that case did not conclude that the juvenile court had violated any provision of the Alabama constitution or the federal constitution when it denied the respondents' motion to stay the termination proceedings but held only that the ruling was an abuse of discretion. See *R.M.* v. *Elmore County Dept. of Human Resources*, supra, 75 So. 3d 1205. Indeed, the Alabama Court of Civil Appeals expressly recognized that the federal constitution ''does not require a stay of civil proceedings pending the outcome of potential criminal proceedings . . . .'' (Internal quotation marks omitted.) Id., 1201. In all of the other cases on which the respondent relies, the courts held that it violates the federal constitution to require a parent to choose between admitting to having abused a child or having his or her parental rights *automati-*

In re Ivory W.

*cally* terminated for failure to make such an admission. As we explained in part I A of this opinion, the trial court required the respondent to make no such choice in the present case but based its decision exclusively on the evidence presented by the respondent and by the petitioner. See *In re D.L.W.*, 413 S.W.3d 2, 9–10 (Mo. App. 2012) (finding no constitutional violation when termination of father's parental rights was not based solely on his failure to admit to sexual abuse but was based on clear and convincing evidence that there were multiple grounds for termination). We conclude, therefore, that this *Geisler* factor does not support the respondent's claim.

Finally, with respect to the sixth *Geisler* factor—contemporary understandings of applicable economic and sociological norms and relevant public policies—the respondent essentially reiterates her contention under the third *Geisler* factor that the right to family integrity has deep roots in this state. As we already explained, we do not agree that it follows from that fact that the protections afforded by the state constitution in this context are broader than those afforded by the federal constitution. Furthermore, it is against relevant public policy to allow children to remain in foster care for lengthy periods without achieving permanency. Permanency does not mean securing a stable foster placement but, rather, finding a child a permanent and stable home. "[No] child can grow emotionally while in limbo, never really belonging to anyone except on a temporary and ill-defined or partial basis." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn, 483, 495, 940 A.2d 733 (2008). To this end, General Statutes § 17a-111a *mandates* that, in the absence of the exceptional circumstances set forth in subsection (b) of that statute, the petitioner "shall file a petition to terminate parental right pursuant to section 17a-112 if (1) the child has been in the custody of the [petitioner] for at least fifteen

consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition . . . .''[22] If the court approves a permanency plan of termination of parental rights and adoption, which first occurred in this case in August, 2018, General Statutes § 46b-129 (k) (6) requires the petitioner to file a petition for termination of parental rights ''not later than sixty days after such approval if such petition has not previously been filed . . . .'' In addition, General Statutes § 17a-111b (b) provides that a court, upon motion by the petitioner, may determine, by clear and convincing evidence, that the petitioner need not make reasonable efforts to reunify a parent with a child after removal if the parent has subjected the child to certain aggravated circumstances, including the infliction of sexual exploitation or severe physical abuse on the child or the deliberate, nonaccidental killing of the child.[23] If the court determines that reasonable efforts are not required, it must, within thirty days, approve a permanency plan for the child and, if the plan is adoption, require that the commissioner file a petition to terminate parental rights. Thus, as a matter of public policy, the statutory scheme contemplates the petitioner's need to proceed quickly to achieve permanency for children who have been removed from their parents.[24] Indeed, although a parent's fundamental lib-

---

[22] This statutory requirement implements a federal regulation that, in turn, implements the federal Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115. See 45 C.F.R. § 1356.21 (i) (1) (i) and (2) (ii) (2020) (state agency must file petition to terminate the parental rights of parent ''[w]hose child has been in foster care under the responsibility of the . . . agency for [fifteen] of the most recent [twenty-two] months'' in absence of compelling reason for determining that filing petition would not be in best interests of child).

[23] Practice Book § 35a-3 permits the filing of coterminous neglect and termination of parental rights petitions in cases in which the severe nature of the neglect or abuse allegations warrant dispensing with reasonable efforts at reunification.

[24] See General Statutes § 45a-605, which provides: ''(a) The provisions of sections 45a-603 to 45a-622, inclusive [governing, among other things, the appointment of a temporary guardian for the child when an application for

In re Ivory W.

erty interest in the care, custody, and management of his or her child has deep roots in this state's history, these statutory provisions demonstrate that, in more recent times, there has been a growing public recognition of the important interests of children who have been removed from their parents in achieving stability and permanency as quickly as reasonably possible.[25] A rule that the court is constitutionally required to await the outcome of any related criminal proceeding that may have been initiated against the parent before achieving permanency for the children would undermine this public policy.

Moreover, under such a rule, the termination of parental rights proceeding could be delayed whenever there was a *possibility* of related criminal charges. In some cases, the applicable statute of limitations could prolong the period of uncertainty for years. Similarly, an appeal from a criminal conviction or a petition for a writ of habeas corpus could mean years of delay. Such a delay would not only leave the children in limbo, in contravention of the statutory guidelines requiring the prompt resolution of such proceedings in the interests of permanency, but it could also mean that witnesses would become unavailable and memories would fade, thereby impeding the ability of the parties to fully and fairly present their case.

Because we conclude that none of the *Geisler* factors supports the respondent's claim that the trial court's

termination of parental rights has been made], shall be liberally construed in the best interests of any minor child affected by them, provided the requirements of such sections are otherwise satisfied.

"(b) All proceedings held under said sections shall, in the best interests of the minor child, be held without unreasonable delay."

[25] See, e.g., 115 Am. Jur. Trials 465, 477, § 3 (2010) ("the [federal Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 94 Stat. 500] focused more on the preservation and reuniting of the family unit, with more deference to parental rights, whereas the [superseding federal Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115] is more concerned with the rights of children to be healthy and to have a safe, permanent home").

In re Ivory W.

denial of her motion for a continuance of the termination of parental rights proceedings pending the conclusion of the criminal proceedings violated her due process rights under the Connecticut constitution, we reject this claim.

II

We next address the respondent's claim that the trial court abused its discretion when it denied her motion for a continuance of the termination of parental rights proceeding pending the conclusion of the criminal proceeding. We disagree.

"[W]hen there are parallel civil and criminal proceedings, the courts have discretion to stay discovery in a civil proceeding or to stay the action in its entirety if required by the interests of justice." *Tyler* v. *Shenkman-Tyler*, supra, 115 Conn. App. 528. "In determining whether to impose a stay . . . the court must balance the interests of the litigants, nonparties, the public and the court itself. . . . The factors a court should consider include: [1] the interests of the [nonmoving party] in an expeditious resolution and the prejudice to the [nonmoving party] in not proceeding; [2] the interests of and burdens on the [moving party]; [3] the convenience to the court in the management of its docket and in the efficient use of judicial resources; [4] the interests of other persons not parties to the civil litigation; and [5] the interests of the public in the pending civil and criminal actions." (Internal quotation marks omitted.) Id., 529; see also *State* v. *Coney*, 266 Conn. 787, 802, 835 A.2d 977 (2003) (factors to be considered in determining whether continuance should be granted include "the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request;

[and] the [moving party's] personal responsibility for the timing of the request'' (internal quotation marks omitted)).

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary.'' (Internal quotation marks omitted.) *State* v. *Coney*, supra, 266 Conn. 801.

With these principles in mind, we address the respondent's claim that the trial court abused its discretion when it denied her fourth motion for a continuance. The strongest consideration in the respondent's favor is that granting the continuance would have allowed her to testify in her own defense at a proceeding involving her fundamental liberty interest in parenting her children.

This consideration, however, must be weighed against the countervailing facts that, at the time that the respondent filed her fourth motion for a continuance on December 30, 2020, (1) the trial court already had granted three continuances and the trial had been delayed for more than eighteen months, (2) Ivory and Darrick, who were then, respectively, five and seven years old, had been in the petitioner's custody for more than three years and in a preadoptive foster home for more than two years, and (3) the criminal proceeding in federal court had been postponed indefinitely as the result of the COVID-19 pandemic. The trial court concluded, after granting the respondent's third motion for a continuance, that, at their young age, the two children

"desperately need[ed] permanency." See, e.g., *In re Davonta V.*, supra, 285 Conn. 494 ("[t]his court has noted consistently the importance of permanency in children's lives" (internal quotation marks omitted)); see also id., 495 ("[n]o child can grow emotionally while in limbo, never really belonging to anyone except on a temporary and ill-defined or partial basis" (internal quotation marks omitted)). We therefore conclude that it was not unreasonable for the trial court to conclude that the interests of the children and the petitioner in having the matter resolved as soon as reasonably possible outweighed the respondent's interest in postponing the matter so that she could testify, especially when she was seeking a postponement for an indefinite period. See *Ex parte K.G.*, supra, 2021 WL 2878696, *7, *9 (trial court did not abuse its discretion when it denied mother's motion to stay termination of parental rights proceeding pending conclusion of criminal proceedings when mother presented no evidence "regarding the length of time the mother [was] advocating that a permanency determination for the children be postponed"); *Burkett* v. *Arkansas Dept. of Human Services*, supra, 507 S.W.3d 534 (trial court did not abuse its discretion when it denied father's motion to stay termination of parental rights proceeding pending conclusion of related criminal proceedings because "a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances"); *In re Quinn*, 54 Mass. App. 117, 122, 763 N.E.2d 573 (2002) (trial court did not abuse its discretion when it denied request to continue "care and protection trial" pending resolution of related criminal proceeding because paramount interests of children in speedy resolution of case outweighed father's interest in testifying in his own defense).

We also find it significant that, by the time the respondent filed her fourth motion for a continuance, the trial

In re Ivory W.

court already had determined that the children had been neglected and had committed them to the petitioner's custody, partly on the basis of undisputed evidence that the respondent had admitted to Meriden police detectives and others that she had distributed sexually explicit photographs of Ivory to multiple persons. We further note that the respondent did not make an offer of proof indicating the nature of her testimony that she wanted to present if the continuance were granted.[26]

---

[26] The respondent contends that, although "[s]he may not have contested the allegations [at the temporary custody hearing or during the neglect adjudication] . . . she certainly did not admit them." She further contends that she "objected to every permanency plan . . . and consistently reserved her defenses for trial—reservations that the petitioner failed to object to even once." (Emphasis omitted.) The fact remains, however, that, to this day, the respondent has not explained how the testimony that she would have given if the trial court had granted her motion for a continuance would have affected the outcome of the termination proceeding. On appeal, the respondent indicates that she was precluded from testifying regarding the timing of her engagement with therapy on her own initiative, but she makes no claim that this testimony could have turned the tide in her favor; nor does she claim that she was the exclusive source of this information. Indeed, in response to the petitioner's claim that any constitutional error was harmless, she claims that the trial court was required to grant the continuance *regardless* of whether her testimony would have affected the result because denying her the opportunity to testify in her own defense was structural error. See *State* v. *Brown*, 279 Conn. 493, 505, 903 A.2d 169 (2006) (structural error exists when "the error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis . . . because of [t]he inability to assess the effect of [the] impropriety on the . . . trial" (citations omitted; internal quotation marks omitted)). The respondent cites no authority, however, for the proposition that a trial court's exclusion of evidence in any form or for any reason can constitute structural error. Cf. *Ray* v. *Commonwealth*, 55 Va. App. 647, 652, 688 S.E.2d 879 (2010) ("the exclusion of a [witness'] testimony could never defy the ordinary harmless error analysis"); id. ("Proffering the expected testimony of an excluded witness requires only that the litigant disclose what he in good faith believes the witness would likely say. No [litigant] could reasonably expect a trial judge to make a decision to admit or exclude challenged testimony without receiving such a proffer. Nor can a [litigant] expect an appellate court to vacate a criminal conviction and order a new trial without knowing whether the excluded testimony was admissible, relevant, or in the least bit probative. A trial court's exclusion of a witness, even if erroneous, does not constitute structural error and thus does not suspend the longstanding requirement of a proffer.").

In re Ivory W.

We conclude that it was not unreasonable for the trial court to consider the seriousness of the established neglect allegations and the weight of the evidence supporting those allegations when determining whether a continuance should be granted to allow the respondent to testify in her own defense. We emphasize that we do not suggest that the respondent's right to testify in her own defense was diminished by these circumstances. We conclude, however, that, in the absence of any offer of proof as to the substance of the testimony that the respondent would present if her motion for a continuance were granted or any claim that her testimony could affect the outcome of the termination proceeding, the trial court was not required to grant the motion. See *In re Lukas K.*, 300 Conn. 463, 473, 14 A.3d 990 (2011) (trial court properly denied request for continuance of termination of parental rights proceeding when respondent father "gave no indication to the trial court . . . by offer of proof or otherwise, as to the specific nature of the additional evidence that he would have presented or attempted to elicit from the petitioner's witnesses" if continuance were to be granted). We conclude, therefore, that the trial court did not abuse its discretion when it denied the respondent's fourth motion for a continuance of the termination of parental rights proceeding pending the conclusion of the criminal proceedings.

In support of her claim to the contrary, the respondent contends that the children's needs were entitled

It may well be that there are circumstances under which a respondent in a termination of parental rights proceeding who is seeking a continuance pending the conclusion of a related criminal proceeding need not make a proffer of the specific testimony that he or she would give if the continuance were granted. As we discuss in this opinion, however, there were, in the present case, important interests weighing against the respondent's interest in postponing the termination proceeding, and the burden was on her to establish that a continuance was warranted. Under these circumstances, we conclude that, if the respondent believed that her testimony was so significant that it outweighed these competing interests and could affect the outcome of the termination proceeding, it was incumbent on her to explain why.

In re Ivory W.

to little or no weight because, at the time that she filed the fourth motion for a continuance, they were thriving in their foster home and they presumably would have continued to do so during the period that the trial was delayed. As we have explained, however, a sense of *permanency*, in and of itself, is crucial for a child's welfare. See *In re Davonta V.*, supra, 285 Conn. 495 ("[n]o child can grow emotionally while in limbo, never really belonging to anyone except on a temporary and ill-defined or partial basis" (internal quotation marks omitted)). Indeed, as we indicated, the children themselves had expressed a desire for permanency so that they would no longer have people "ask[ing] them questions all the time." Delaying the trial indefinitely would have meant keeping these very young children in a state of limbo indefinitely. Accordingly, we reject the respondent's claim.

III

Finally, we address the respondent's claim that we should exercise our supervisory authority to require our trial courts to grant a respondent's motion for a continuance of a termination of parental rights proceeding whenever the respondent has invoked his or her fifth amendment privilege against self-incrimination in a criminal proceeding involving the same misconduct. We disagree.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . .

"We recognize that this court's supervisory authority is not a form of free-floating justice, untethered to legal

In re Ivory W.

principle. . . . Rather, the rule invoking our use of supervisory power is one that, as a matter of policy, is relevant to the perceived fairness of the judicial system as a whole, most typically in that it lends itself to the adoption of a procedural rule that will guide lower courts in the administration of justice in all aspects of the [adjudicatory] process. . . . Indeed, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of [this court's] supervisory powers." (Citations omitted; internal quotation marks omitted.) *In re Yasiel R.*, 317 Conn. 773, 789–90, 120 A.3d 1188 (2015).

We conclude that a rule requiring trial courts to grant all requests for continuances by respondents in termination of parental rights proceedings when the respondent has invoked his or her fifth amendment privilege against self-incrimination in connection with a related criminal proceeding is not required to ensure the fairness and integrity of the judicial system. To the contrary, such a rule would *deprive* trial courts of their ability to consider the fairness of their rulings by eliminating their discretion to consider "[1] the interests of the [nonmoving party] in an expeditious resolution and the prejudice to the [nonmoving party] in not proceeding; [2] the interests of and burdens on the [moving party]; [3] the convenience to the court in the management of its docket and in the efficient use of judicial resources; [4] the interests of other persons not parties to the civil litigation; and [5] the interests of the public in the pending civil and criminal actions"; (internal quotation marks omitted) *Tyler* v. *Shenkman-Tyler*, supra, 115 Conn. App. 529; as well as "the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support

In re Ivory W.

of the request; [and] the [moving party's] personal responsibility for the timing of the request . . . .'' (Internal quotation marks omitted.) *State* v. *Coney*, supra, 266 Conn. 802. In reaching this conclusion, we emphasize that courts must consider a respondent's important interest in testifying in his or her own defense in a matter involving a fundamental liberty interest when ruling on a motion for a continuance pending the resolution of a related criminal proceeding. As the circumstances of the present case show, however, there are other weighty interests that also are entitled to consideration. Although there may be cases in which fairness requires the granting of a respondent's motion for a continuance when a criminal proceeding is pending, particularly when it is near resolution, we decline the respondent's invitation to deprive trial courts of their ability to consider and balance these important interests when determining whether a continuance should be granted to await the outcome of a pending or impending criminal proceeding.[27] Accordingly, we reject this claim.

The judgments are affirmed.

In this opinion the other justices concurred.

---

[27] As we explained in part II of this opinion, the factors that weighed in favor of denying the respondent's motion for a continuance in the present case included (1) the fact that the respondent had previously filed three motions for a continuance and the termination of parental rights trial already had been delayed for eighteen months, (2) the young age of the children, (3) the needs of the children, who had been in the petitioner's custody for more than three years and in a preadoptive foster home for more than two years, for permanency, (4) the fact that the respondent sought an indefinite postponement, (5) the seriousness of the allegations against the respondent and the weight of the evidence supporting them, and (6) the fact that the respondent did not indicate the nature of the testimony she would give if the motion for a continuance were granted. In the absence of any of these factors, our conclusion might be different.